(958 P.2d 1162)
No. 76,598

NORA H. RINGLER REVOCABLE FAMILY TRUST, NORA H. RINGLER, TRUSTEE, *Appellant*, v. MEYER LAND AND CATTLE CO., INC., CHRIS M. MEYER and TIMOTHY MEYER, *Appellees*.

May 22, 1998.

*Michael S. Holland*, of Russell, for appellant.

*David A. Hanson* and *Bruce Alan Brumley*, of Glenn, Cornish, Hanson & Karns, Chartered, of Topeka, for appellees.

Before ELLIOTT, P.J., DAVID PRAGER, Chief Justice Retired, and PATRICK D. MCANANY, District Judge, assigned.

ELLIOTT, J.: Nora H. Ringler, as trustee of the Nora Ringler Revocable Family Trust, (Trust or plaintiff) appeals the trial court's denial of her request for injunctive relief, by which she sought to enjoin Meyer Land and Cattle Co., Inc., Chris M. Meyer, and Timothy Meyer (Meyer or defendants) from expanding a confined livestock feeding facility near a dwelling located on Trust property.

We reverse and remand.

### Facts

The factual history of this case is rather long, but must be detailed in order to place in proper perspective some of the issues we must decide.

In April 1992, the Kansas Department of Health and Environment (KDHE) issued a 5-year permit to defendants pursuant to K.S.A. 65-164 *et seq.*, allowing defendants to operate water pollution control facilities with respect to livestock waste water on their property. The permit indicated defendants utilized 10 pens for confined feeding on facilities for about 1,000 head of cattle.

Plaintiff then sued KDHE and defendants in Shawnee County with respect to the permit; defendants' motion to dismiss was denied, and the trial court ruled that KDHE's notice of agency action did not give sufficient due process notice to plaintiff. The trial court also noted that defendants' permit application indicated the nearest dwelling to their facility was one-half mile away, but that plaintiff owned a dwelling only 50 feet from the facility. The trial court then advised plaintiff of her administrative avenues to seek revocation of the permit. This civil suit was eventually dismissed without prejudice in December 1993.

Meanwhile, plaintiff sought revocation of defendants' permit before the KDHE. Following a public hearing, agency staff recommended revocation of defendants' permit. A subsequent hearing officer memorandum also recommended revocation of the permit.

In June 1993, KDHE ordered defendants' permit terminated due to inaccuracies in the application relating to the status of plaintiff's dwelling. Defendants were also given notice of KDHE's intent to revoke their permit. Defendants challenged the KDHE decision; a presiding officer was appointed and an adjudicative hearing was held in March of 1994.

In an order dated July 13, 1994, the presiding officer held that defendants' permit should be terminated. The presiding officer noted the primary purpose of the separation distance requirements was to create a buffer zone between a facility and habitable buildings in order to minimize potential for the generation of nuisance conditions. The minimum residential separation distance requirement for facilities with a capacity of 1,000 head or less, it was noted, was 1,320 feet.

With respect to plaintiff's dwelling, the presiding officer found the dwelling had been continuously insured and utility services to the dwelling had never been disconnected. While the house was not occupied at the time defendants' permit was issued, an employee of plaintiff moved into the dwelling in April 1993.

In December 1994, the Secretary of KDHE adopted most of the presiding officer's findings and conclusions, found that defendants' application "was in fact incomplete and incorrect," and upheld the revocation of defendants' permit. The decision to revoke defendants' permit did not, however, end the matter.

KDHE noted that the permit had been issued pursuant to K.S.A. 65-171h and further noted the passage of S.B. 800 (L. 1994, ch. 213, § 1). The KDHE Secretary then found that K.S.A. 1994 Supp. 65-171d(k) exempted defendants' facility from separation distance requirements *if* the Meyer facility was "permitted or certified" by KDHE *or if* it existed as a confined feeding facility on July 1, 1994. KDHE found the facility was not certified due to the revocation of the permit and concluded there was not enough evidence to determine if the facility existed as of July 1, 1994; the matter was remanded to the presiding officer.

On remand, the presiding officer took additional evidence and issued a report and order dated June 29, 1995, finding that defendants had completed one pen capable of permanent confinement

as of June 27, 1994, and had concrete feedbunks and runways in existence at that time; that the facility had a portable water supply and a portable generator to provide electricity; and that the facility contained 40-50 head of cattle as of June 28, 1994.

The presiding officer then ruled that defendants' facility met the definitions set forth in 1994 Supp. 65-171d(c)(2) before July 1, 1994; that the 1992 permit was revoked; and that the facility was exempt from the distance requirements under K.S.A. 1994 Supp. 65-171d(k). So far as we can determine, neither party appealed this order.

Instead, some 4 months later, plaintiff filed the present action, reciting the history of the KDHE proceedings and the final order of June 29, 1995, finding defendants' facility to be exempt from the statutory distance requirements. Plaintiff also alleged that defendants had or were attempting to expand the facility after the KDHE order of June 29, 1995, and claimed the expansion violated K.S.A. 1994 Supp. 65-171d in that the *expanded* facility was located at a distance from plaintiff's dwelling less than permitted by K.S.A. 1994 Supp. 65-171d(k)(3). Plaintiff sought an order enjoining defendants from expanding their facility and an order directing defendants to remove all facilities added since the June 1995 KDHE order.

In their answer, defendants admitted most of plaintiff's allegations about the KDHE proceedings, but denied the allegations central to plaintiff's suit that they had violated state law since the KDHE order. Eventually, defendants moved for judgment on the pleadings pursuant to K.S.A. 60-212(c). In April 1996, the trial court ruled in defendants' favor.

In its order, the trial court found that while defendants' facility contained only 40-50 head prior to July 1, 1994, it had been designed to accommodate about 1,000 head. The trial court also found that since the KDHE order found defendants' facility exempt, plaintiff was obligated to seek judicial review of that order if she wished to challenge the exemption. Finally, the trial court found that expansion of defendants' facility was not precluded so long as the distance between the facility's *perimeter* and plaintiff's dwelling was not reduced.

This appeal follows.

As a preliminary matter, at oral argument we asked counsel to file supplemental briefs on the question of whether K.S.A. 1994 Supp. 65-171d creates a private right of action allowing plaintiff trust to bring a civil action seeking injunctive relief to enforce the statute's separation distance provisions. We answer the question in the affirmative and express no opinion as to whether the statute creates a private right of action allowing a plaintiff to seek monetary damages.

Whether a private right of action exists under a statute is a question of law. *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 281, 875 P.2d 949 (1994). Generally, Kansas courts have developed a two-part test for determining whether a private right of action is created. First, the party must show that the statute was designed to protect a specific group of people rather than to protect the general public. See *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 340, 918 P.2d 1274 (1996).

Second, the court must review legislative history in order to determine whether a private right of action was intended. 260 Kan. at 340; see *Jack v. City of Wichita*, 23 Kan. App. 2d 606, 611, 933 P.2d 787 (1997). This two-part test developed in Kansas is similar to that created by the United States Supreme Court when evaluating whether private rights of action are created under federal statutes. See *Cort v. Ash*, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975). The Kansas Supreme Court has noted the similarity between its two-part test and the *Cort* analysis. See *Greenlee v. Board of Clay County Comm'rs*, 241 Kan. 802, 805-06, 740 P.2d 606 (1987).

In *Schlobohm v. United Parcel Service, Inc.*, 248 Kan. 122, 804 P.2d 978 (1991), for example, plaintiff attempted to establish negligence by showing the building's entrance violated the city's building code governing elevation differentials in doorway thresholds. 248 Kan. at 123. The Supreme Court reasoned the provisions of the code limiting threshold elevation differentials were designed to protect a special class of people: those who enter and exit the doorways. 248 Kan. at 127. The court did not go into any detail in discussing legislative history and whether the city had intended to

create a private right of action. See *Grindsted Products, Inc. v. Kansas City Power & Light Co.*, 21 Kan. App. 2d 435, 441-42, 901 P.2d 20 (1995); *Dietz v. Atchison, Topeka & Santa Fe Rwy. Co.*, 16 Kan. App. 2d 342, 345-46, 823 P.2d 810 (1991), *rev. denied* 250 Kan. 804 (1992).

On the other hand, Kansas courts have also found a private right of action did *not* exist under the two-part test. *E.g., Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 370-73, 819 P.2d 587 (1991); *Brunett v. Albrecht*, 248 Kan. 634, 642, 810 P.2d 276 (1991).

Under Kansas law, then, we must evaluate the purpose and intent of the separation distance requirements of K.S.A. 1994 Supp. 65-171d. A brief history of the 1994 amendments is helpful. The 1994 amendments were enacted as part of S.B. 800, which was originally designed to raise the capacity limits of confined feeding operations requiring licensing and regulation by KDHE. As originally proposed, S.B. 800 did not contain any distance requirements for confined feeding operations. See Minutes of Senate Agriculture Committee, February 22, 1994. Prior to the 1994 amendments, KDHE required all operations holding 300 head or more to be licensed. K.A.R. 28-18-1 (1992).

It appears to us that KDHE was seeking to increase its budget for fiscal year 1995, and in order to partially fund those increases, KDHE proposed to substantially increase licensing fees for confined feedlot operations. The request for an increased budget was apparently denied, and S.B. 800 was proposed as an alternative. See Minutes of Senate Agriculture Committee, February 22, 1994, Attachment 1—Statement of Kansas Livestock Association (KLA). The original version of S.B. 800 was supported by the KLA and other industry associations, who noted that by increasing the threshold to 1,000 head of livestock, KDHE's costs could be reduced since 90% of the licensed facilities in Kansas contain less than 1,000 head. See Minutes of Senate Agriculture Committee, February 22, 1994, Attachment 1—Statement of KLA.

The only opposition voiced during the Senate committee hearing came from the Kansas Natural Resource Council and the Kansas Sierra Club (KNRC); KNRC claimed S.B. 800 "gutted" KDHE's

regulatory authority. See Minutes of Senate Agriculture Committee, February 22, 1994, Attachment 3—Testimony of William Craven.

Interestingly, KDHE's testimony on S.B. 800 and the amendments proposed by the KLA were noncommittal. Rather, KDHE focused more on its proposal to increase fees for feeding operations of more than 1,000 head. See Minutes of Senate Agriculture Committee, February 22, 1994, Attachment 4—Testimony of KDHE.

The Senate committee approved the bill with the KLA amendments and referred it to the full Senate. Sen. J. 1994, pp. 1483-84. The Senate passed the bill and sent it to the House (Sen. J. 1994, p. 1545), where it was referred to the House Agriculture Committee, House J. 1994, p. 1724.

Considerably more opposition to S.B. 800 surfaced during House committee hearings. Six individuals testified, objecting to the deregulation of confined feeding operations and telling of feedlots located very near their homes and the problems created by stench, runoff, and insects. There was also testimony of KDHE inaction when complaints were made by individuals. See Minutes of House Agriculture Committee, March 9, 1994—Attachment 4. In addition, opposition was expressed by KNRC, the Kansas Water Office and the League of Women Voters. See Minutes of House Agriculture Committee, March 11, 1994.

The House committee recommended amendments requiring separation distance from residences, although it grandparented currently licensed facilities. See Minutes of House Agriculture Committee, March 18, 1994, 120-25. The bill, as amended, was approved by the committee. House J. 1994, p. 1866. The committee minutes are silent as to whether private citizens could bring an action to enforce the separation distance added to the bill.

The amended version of S.B. 800 was passed by the House. See House J. 1994, p. 1993. A conference committee was convened by both houses. House J. 1994, p. 2093. There are, of course, no minutes available from conference committee meetings. In any event, the Senate acceded to the House amendments with some minor changes. House J. 1994, pp. 2236-38. The final amended bill was passed by both houses (House J. 1994, pp. 2238-39; Sen.

J. 1994, p. 2039), and Governor Finney signed the bill into law. Sen. J. 1994, p. 2271.

*Application of two-part test to K.S.A. 1994 Supp. 65-171d*

With this history in mind, we focus on whether the two-part test is satisfied. The first question is whether the separation distance requirements of K.S.A. 1994 Supp. 65-171d were intended to protect a particular class of persons or merely designed to protect the interest of the general public.

In reviewing how S.B. 800 developed through the legislative process, it seems clear that the separation distance provisions were added in direct response to the individuals' testimony about problems caused by smaller feedlots built close to their homes. The addition of the separation distance provisions was a legislative recognition of the concern of neighbors regarding what could happen if KDHE's authority over smaller feedlots was reduced.

The Trust has passed the first test, under the reasoning of *Schlobohm*, 248 Kan. at 126-27. With respect to the separation distance requirements, a distinct part of K.S.A. 1994 Supp. 65-171d, it is clear those specific provisions were designed to protect a special class of persons and that the Trust falls within that class.

The second question is whether the language of the statute or its purposes reflect a legislative intent to create a private right of action. This is the more difficult question of the two-part test. Meyer makes two arguments that no inference can be found supporting a legislative intent to create a private right of action permitting neighbors to sue one another for alleged violations of the distance provisions.

First, Meyer contends the discretion given to KDHE to reduce the statutory separation distance negates any basis for a private right of action. We disagree. K.S.A. 1994 Supp. 65-171d does not give KDHE much, if any, discretion to *reduce* the separation distances. KDHE may waive the permit requirements of facilities with a capacity of 300 to 999 head, but only if there is no water pollution potential and no violation of the separation distances. K.S.A. 1994 Supp. 65-171d(h).

K.S.A. 1994 Supp. 65-171d(j) waives the distance requirements on the written agreement of all owners of habitable structures within the separation distance and gives KDHE discretion to reduce the distances if one of two clearly objective standards is met. Based on the purely objective standard of the statute, it cannot necessarily be construed as negating a private right of action.

Meyer also argues that the language of a related statute, K.S.A. 65-170e, negates any inference of a legislative intent to create a private right of action. That statute provides in part:

"(a) The attorney general, upon the request of the secretary of health and environment, may bring an action in the name of the state of Kansas . . . to recover penalties or damages as provided by this act;

"(b) Any person having an identifiable interest which is affected shall have the right to intervene in any civil actions brought under this section or K.S.A. 67-171b . . . or in administrative actions subsequent to the issuance of an administrative order by the agency . . ., which seek:

. . . .

"(2) injunction of threatened or continuing violations of this act, rules and regulations promulgated thereunder and permit conditions."

K.S.A. 65-170e was originally enacted in 1973, and the current provisions are an apparent attempt to comply with the federal Water Pollution Control Act (WPCA), 33 U.S.C. § 1251 *et seq.* (1994), and related regulations. One of those regulations, 40 C.F.R. § 123.27(d) (1997), requires states to provide for public participation in the state enforcement process. See Att'y Gen. Op. No. 91-68.

The intervention provisions of K.S.A. 65-170e were last amended in 1990, well before the statutory amendments with which we are here concerned. When the legislature enacted S.B. 800, it made no attempt to expand K.S.A. 65-170e. S.B. 800, however, was an effort to modify the state's water pollution control program, but did not necessarily have an impact on federal guidelines contained in the WPCA. So long as states comply with the federal guidelines, they are free to define and administer their own pollution control programs. See Att'y Gen. Op. No. 91-68 at p. 4.

Since S.B. 800 was designed only to alter the way in which KDHE implements its water pollution control programs, the legislature probably never considered whether to change K.S.A. 65-

170e. Because the legislature in passing S.B. 800 did not appear to be amending the statute to comport with the WPCA, the legislature simply did not consider whether K.S.A. 65-170e should be the sole remedial avenue for the general public with respect to the newly developed separation distance standards.

Further, while the separation provisions of K.S.A. 65-171d are contained within the water pollution control statutes, those provisions appear to be aimed more at preventing nuisance problems which may be easily caused by even small confined feeding operations. And we have recognized that a private nuisance action may lie against the operator of an expanded feedlot operated on private agricultural land notwithstanding our "right to farm" law if there has been a change in the nature of the agricultural activity on the property or if the operation does not conform with state regulations. *Finlay v. Finlay*, 18 Kan. App. 2d 479, 483-85, 856 P.2d 183, *rev. denied* 253 Kan. 857 (1993).

Finally, we note that the sole original purpose of S.B. 800 was to give KDHE authority to waive permits or require permits for medium-sized confined feeding facilities (300-999 head). As originally passed by the Senate, it was an industry effort to reduce KDHE's operational costs by partly deregulating feedlots and providing for KDHE to focus its limited resources on the largest operations (1,000+ head).

This legislation was specifically designed to prevent substantial increases in the fees required by KDHE for licensing. To that end, KDHE presented testimony that its confined feeding program was staffed by only six field technicians and two engineers; that the program had to monitor over 1,500 facilities holding state and federal permits as well as certify that over 1,700 facilities needed no pollution controls; and that the volume of plans for new or expanded facilities create continuous backlogs. See Minutes of Senate Agriculture Committee, February 22, 1994, Attachment 4—Testimony of KDHE.

We, therefore, conclude that the legislature, knowing of KDHE's limited resources and citizens' complaints that small feedlots were causing considerable nuisance problems, intended to allow private citizens to enforce the clear and objective separation

distance requirements included in K.S.A. 1994 Supp. 65-171d by injunctive relief.

Absent a private right of action, facilities could be built or expanded without limitation unless KDHE stepped forward. Persons such as plaintiff would have no recourse to protect their habitable dwellings except by demanding KDHE action and then bringing a mandamus action against KDHE should it fail to carry out its duties. Given KDHE's acknowledged limited resources and the testimony before the House that KDHE was unresponsive to many citizen complaints, such a limited remedy would undermine the clear statutory standards set by K.S.A. 1994 Supp. 65-171d.

### Merits

At last, we turn to the merits of this appeal.

Plaintiff first attacks the trial court's ruling dismissing her petition because she failed to exhaust her administrative remedies. In essence, the trial court treated plaintiff's petition as a challenge as to whether defendants' facility was exempt from distance requirements under K.S.A. 1994 Supp. 65-171d(k).

Clearly, a party *challenging* an administrative order must exhaust all administrative remedies before seeking judicial review of the agency action. *E.g., J. Enterprises, Inc. v. Board of Harvey County Comm'rs*, 253 Kan. 552, 555, 857 P.2d 666 (1993). Whether a party is required to or has failed to exhaust its administrative remedies is a question of law over which our review is plenary or unlimited. *Kyburz v. Franklin*, 23 Kan. App. 2d 423, 934 P.2d 141 (1997).

In her petition, plaintiff acknowledges that defendants' facility *as of July 1, 1994*, was a confined feeding facility under K.S.A. 1994 Supp. 65-171d(c)(2) and, therefore, exempt from the separation requirements of the 1994 law. Plaintiff does not challenge that exemption to the extent it applies to defendants' facility as it existed on July 1, 1994.

Plaintiff's complaint, rather, is that after KDHE's June 1995 order, defendants expanded their exempt facility and that the *expansion* was contrary to the statute. In other words, plaintiff is simply claiming that the acknowledged exemption does not apply to defendants' *expansion.*

Based on the allegations of the petition, plaintiff is not challenging the KDHE order; plaintiff is seeking to enjoin subsequent conduct which she alleges violates state law. Since plaintiff is not challenging KDHE's decision to revoke defendants' 1992 permit or the KDHE decision that defendants' facility as of June 1, 1994, was exempt, plaintiff was not required to appeal from the KDHE presiding officer's order of June 1995. The trial court erred in this respect.

Plaintiff next argues the trial court erred in determining that defendants' expanded facility did not decrease the distance between plaintiff's dwelling and defendants' facility. The question for us to decide is whether the trial court properly interpreted the various provisions of K.S.A. 1994 Supp. 65-171d. Interpretation of a statute is a question of law, and our review is unlimited. *State v. Palmer*, 262 Kan. 745, Syl. ¶ 1, 942 P.2d 19 (1997).

The parties appear to dispute whether there was an expansion of defendants' facility within the meaning of K.S.A. 1994 Supp. 65-171d(i) or (k). Plaintiff argues an expansion occurred because defendants added pens, a lagoon, and other amenities beyond what existed on July 1, 1994. Defendants contend the KDHE exemption cannot be limited to the single pen mentioned in the KDHE final order, relying on language in a nonfinal ruling made by the KDHE Secretary prior to the final order of June 29, 1995.

Based on the KDHE final order, it appears that a few days prior to the July 1, 1994, effective date of S.B. 800, defendants' confined feeding facility consisted of one pen capable of permanent confinement, some concrete feedbunks and runways, a portable water supply and a portable generator to provide electricity. According to plaintiff's petition, defendants expanded or were attempting to expand the facility after the KDHE final order was issued.

Under K.S.A. 60-212(c), the trial court was required to accept as true plaintiff's allegation that defendants' facility was bigger or expanded beyond what existed on July 1, 1994. Assuming that to be the case, the question becomes: Does that constitute an "expansion" under K.S.A. 1994 Supp. 65-171d? The statute defines "confined feeding facility" but does not define the term "expansion" as used in K.S.A. 1994 Supp. 65-171d(i) and (k).

Relevant portions of K.S.A. 1994 Supp. 65-171d provide:

"(i) Any new construction or new expansion of a confined feeding facility shall meet or exceed the following requirements in separation distances from any habitable structure:

"(1) 1320 feet for facilities with an animal unit capacity of 300 to 999; and

"(2) 4000 feet for facilities with an animal unit capacity of 1,000 or more.

. . . .

"(k) The separation distances required pursuant to subsection (i) shall not apply to:

"(1) Confined feeding facilities which are permitted or certified by the secretary on the effective date of this act;

"(2) confined feeding facilities which exist on the effective date of this act and register with the secretary before July 1, 1996; or

"(3) *expansion* of a confined feeding facility, including any expansion for which an application is pending of the effective date of this act, if: . . . (B) in the case of a facility with an animal unit capacity of less than 1,000 prior to the effective date of this act and, *the expansion is located at a distance not less than the distance between the facility and the nearest habitable structure prior to the expansion* the animal unit capacity of the facility after expansion does not exceed 2,000." (Emphasis added.)

To narrow the central issue on this appeal, KDHE found defendants' facility to be exempt from the separation requirements of the statute as of July 1, 1994, and plaintiff does not contest that finding. The narrow issue is whether defendants have *expanded* their facility since July 1, 1994, and if so, whether K.S.A. 65-171d(k)(3)(B) exempts that expansion from the distance requirements.

In their motion for judgment on the pleadings, defendants appear to concede there were additional pens added to their facility after the KDHE order, but argue that such pens are within the facility. At least one of these pens was built between the first pen and a lagoon located across from plaintiff's property. It is not clear whether this lagoon was added after July 1, 1994, although it certainly was not mentioned in KDHE's final order.

The trial court found the distance between the *perimeter* of defendants' facility and plaintiff's dwelling was 50 feet at the time of the KDHE order. The trial court also found that the additional pens and improvements were built within that *perimeter* of the existing facility and, therefore, did not alter the distance between

the facility and plaintiff's dwelling. Because the distance between the facility's *perimeter* and the dwelling did not change, the trial court found the facility remained exempt under the statute.

Since there are two provisions regulating expansion of confined feeding proceedings and because defendants' facility was "grand-parented" in under the 1994 legislation, we note the parties agree that K.S.A. 1994 Supp. 65-171d(k)(3) applies to this case. This agreement is consistent with Att'y Gen. Op. No. 94-92.

We have a couple of problems with the trial court's ruling in this case. With respect to the trial court's factual finding that there had been no decrease in the distance between the two structures, the record on appeal is not clear how the trial court reached that finding, especially in ruling on a motion for judgment on the pleadings. That motion requires the trial court to determine whether, based on the admitted facts, plaintiff has stated a claim. *Tabor v. Lederer*, 205 Kan. 746, 748, 472 P.2d 209 (1970); *Jack v. City of Wichita*, 23 Kan. App. 2d 606, 607, 933 P.2d 787 (1997); see *Clear Water Truck Co., Inc. v. M. Bruenger & Co., Inc.*, 214 Kan. 139, 140, 519 P.2d 682 (1974).

As stated before, under K.S.A. 60-212(c), the trial court was required to accept plaintiff's factual allegations as true. Plaintiff specifically alleged that "defendants' expansion of its [*sic*] one pen facility decreases the distance between plaintiff's habitable structure and/or property." While defendants denied this allegation in their answer, the allegation must be accepted as true. Nonetheless, the trial court considered there had been no decrease in the distance between the two structures. The source of the trial court's factual conclusion is not entirely clear. In their motion, defendants relied on allegations in their answer and on various documents from the KDHE proceedings. Those KDHE records, however, were all issued *prior to* defendants' alleged expansion and, therefore, cannot support any finding relating to the distances between the properties after the "admitted" expansion. Accordingly, the trial court erred, as a matter of law, in making the factual finding that there had been no decrease in the distance between the structures.

Second, there remains a question regarding the trial court's legal conclusion that "expansion" is to be based on some undefined perimeter of the property. As previously noted, the separation distances would not apply to defendants' expansion *if* the "expansion is located at a distance not less than the distance between the facility and the nearest habitable structure prior to the expansion." K.S.A. 1994 Supp. 65-171d(k)(3).

It is presumed the legislature understands the words it uses and intends to use those words in their common and ordinary meaning. See *Bank of Kansas v. Davison*, 253 Kan. 780, 788, 861 P.2d 806 (1993).

"Expansion" means to expand. Webster's New Collegiate Dictionary at 398 (1982); and "expand" means to "increase the extent, number, volume or scope of." Webster's at 398 (1982). A reasonable interpretation of the statute, therefore, is that any increase in the feedlot's area, facilities or capacity would be an expansion.

In its motion for judgment on the pleadings, defendants argued their "existing facility" was fully described in its permit. But that permit was revoked by KDHE, and defendants did not appeal that order.

It is undisputed that as of July 1, 1994, defendants' facility did not contain all of the pens and other items specified in the revoked permit. The only evidence as to the status of the facility on July 1, 1994, is found in the KDHE final order, which specifically found the facility had one completed pen capable of permanent confinement, feedbunks, and portable water and electricity supplies.

While defendants contend the KDHE exemption was not limited to the facility described in the KDHE order, it is undisputed that the only facilities in actual existence on July 1, 1994, were those described in the order.

The K.S.A. 1994 Supp. 65-171d(k)(2) exemption applies only to facilities "which exist" on July 1, 1994, the effective date of the act. The statute also specifically provides for an additional exemption for "expansion" of exempt facilities. It is thus clear the legislature intended to provide an exemption for facilities *existing* as of July 1, 1994. This cannot reasonably be interpreted to exempt facilities

which were *planned* but not in existence on that date. To interpret the statute to exempt "planned" expansions would totally negate the "expansion" provisions of K.S.A. 1994 Supp. 171d(i) and (k)(3).

Nor do we read the final KDHE order as exempting the facility as planned as opposed to the facility as it actually existed. The Secretary's order clearly noted there was not sufficient evidence to determine whether the facility existed at all and further noted the exemption applied only to facilities which "exist" on July 1, 1994. That is precisely why the Secretary remanded the matter to the presiding officer for further proceedings. Those findings became the final order of June 1995.

The trial court's decision, which appears to rely on the defendants' facility as planned when they applied for the 1992 permits, reflects an incorrect legal conclusion. First, the distance differences must be based on the actual facility in existence on July 1, 1994, as compared to the facility as it presently exists. The trial court cannot rely on the dimension of a "planned" facility. To determine whether the distance has decreased, the trial court must ultimately determine whether the additional pens, lagoons, etc., are closer to plaintiff's dwelling than the original pen and runways existing on July 1, 1994. This is the only reasonable way to interpret the expansion provision of the statute. To adopt defendants' interpretation would entirely nullify the expansion provisions of the statute.

Further, interpreting the expansion provisions in this manner does not necessarily prevent defendants from expanding their confined feeding facility. They would simply have to expand their feedlot in a direction that does not decrease the distance between their original exempt facility and plaintiff's dwelling. That might require the construction of the expansion to go in a different direction than planned.

Reversed and remanded for a factual determination, in accordance with this opinion, of whether the distance between the parties' structures has been decreased as a result of defendants' expansion.