No. 83,121

THOMAS BRITT NICHOLS, *Appellant*, v. KANSAS POLITICAL
ACTION COMMITTEE, *et al.*, *Appellees.*

(11 P.3d 1134)

Opinion
filed October 27, 2000.

*Thomas Britt Nichols*, of Topeka, argued the cause and was on the brief pro
se.

*David M. Schauner*, Kansas National Education Association, of Topeka, argued
the cause, *Stephen W. Cavanaugh* and *Todd Powell*, of Fisher, Cavanaugh, Smith
& Lemon, P.A., of Topeka, and *David H. Moses*, of Case, Moses, Zimmerman &
Wilson, P.A., of Wichita, were with him on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: In 1996, Thomas Britt Nichols lost his bid for
reelection to the Kansas House of Representatives from the 22nd
District to Representative Sue Storm. Nichols sued individuals,
unincorporated associations, and a corporation, alleging that the
defendants acted in concert to harm him by contributing to Storm's
campaign knowingly and intentionally in violation of the Kansas
Campaign Finance Act (CFA), K.S.A. 25-4142 *et seq*. He sought
declaratory judgment and damages on various theories involving
violations of the CFA. The district court granted defendants' mo-

tions to dismiss. Nichols appealed. The case was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c).

The motions to dismiss were decided on the factual allegations of Nichols' "First Amended Petition." The following recitation of facts is assembled from the allegations of the first amended petition:

In 1996, Nichols was the incumbent member of the Kansas House of Representatives from Representative District 22. Nichols and Sue Storm were candidates for state office within the meaning of the CFA.

Defendants Kansas Political Action Committee (KPAC), Kids First of Kansas (Kids 1st of KS), Kids First of Jefferson County (Kids 1st of JF Cty), and Kids First of Leavenworth County (Kids 1st of LV Cty) were political committees as defined by the CFA. Defendant Kansas National Education Association (KNEA) is a corporation. KNEA is a member of KPAC. KPAC is a member of each of the Kids First associations. KNEA is a member of the county associations of Kids First.

Most individual defendants were members and officers of the Kids First associations:

Anthony Cooper, member and chairperson of Kids 1st of KS;

Cyndi Menzel, member and treasurer of Kids 1st of KS;

Sue Lattin, member and chairperson of Kids 1st of JF Cty;

Becky Nottingham, member of Kids 1st of LV Cty and treasurer of Kids 1st of JF Cty;

Brenda Shaw, member and chairperson of Kids 1st of LV Cty;

Carla Hebert, member and treasurer of Kids 1st of LV Cty.

Craig Grant, the other individual defendant, was employed as a lobbyist by KNEA. Nichols alleged that Grant was engaged in "directing, steering or laundering, in possible violation of state and federal law, political contributions" made to KNEA and KPAC "to pay himself for rendering political services for which he was, presumably, already being paid [by] his other employer(s) and to make excessive and unlawful contributions to a candidate for state office" in violation of the CFA.

The bulk of the CFA violations alleged by Nichols are contributions for the election campaign of Sue Storm in excess of $500

in violation of K.S.A. 25-4153(a)(2) and K.S.A. 25-4154(a). Nichols also alleged that Kids 1st of LV Cty and Kids 1st of JF Cty failed to file organization statements with the Secretary of State as required by K.S.A. 1999 Supp. 25-4145(a).

Finally, Nichols alleged that the defendants, taken together, constitute a political committee as defined in the CFA that has violated the CFA by making contributions to Sue Storm's election campaign and by failing to satisfy filing requirements.

The district court granted the defendants' motions to dismiss, which were for lack of jurisdiction and failure to state a claim for which relief may be granted pursuant to K.S.A. 60-212(b)(1) and (6) and for failure to exhaust administrative remedies. In dismissing Nichols' first amended petition, the district court accepted his allegations as true and decided each issue as a matter of law. A de novo standard of review applies to questions of law. *NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 386, 996 P.2d 821 (2000).

We first consider if Nichols was required to exhaust administrative remedies. The district court viewed Nichols' complaints of CFA violations as a matter entrusted by the legislature to the Commission. With regard to whether Nichols had gone to the Commission with his complaints, the district court stated:

"Plaintiff has failed to exhaust administrative remedies and this Court does not have subject matter jurisdiction over this matter.

"Although Plaintiff requests that this Court take judicial notice of his exhaustion of administrative remedies now, any review of the Commission's orders are subject to K.S.A. 25-4185, which provides for appeal to the district court 'in accordance with the provisions of the act for judicial review and civil enforcement of agency actions.' This case does not involve a petition for judicial review under the act for judicial review and civil enforcement of agency actions (KJRA). If the Plaintiff is unhappy with the agency orders, his remedy is to file an appeal pursuant to the KJRA."

The district court's conclusion that Nichols should have filed a petition for review rather than a petition for an autonomous action is the focus of Nichols' argument. He maintains that his claims are civil claims for relief and damages, which are not subject to the authority of an administrative agency. He characterizes his claims as arising from common law without clearly stating what common-

law causes of action are represented, other than fraud. He mentions "tort, fraud, civil conspiracy or even CFA private right of action."

The district court concluded that because all of Nichols' claims allege violations of the CFA, all of his causes of action arise from the statutes. Even the fraud claim was viewed by the district court as having a statutory origin:

"Although Plaintiff argues that his cause of action for fraud is viable in this Court without the exhaustion of administrative remedies, since his claim for fraud stems from allegations of a legal duty to disclose truthful information pursuant to the CFA, his remedy is, again, an administrative one for violations of the CFA."

Nichols relies on *Gietzen v. Feleciano*, 25 Kan. App. 2d 487, 964 P.2d 699 (1998). He explains his reliance as follows: "[I]t is apparent that the [district] court . . . did not require exhaustion of administrative remedies before determining Gietzen's *Statement of Fair Campaign Practices*-based CFA private right of action claims." Exhaustion of administrative remedies may not have been given as a reason for the district court's ruling, but summary judgment was entered against Gietzen. That judgment was affirmed by the Court of Appeals. *Gietzen* offers no support for Nichols' position. His reliance on *Gietzen* is misplaced.

Nichols also complains that the district court's determination that he had failed to exhaust administrative remedies was not based on facts in the record. In fact, the trial court's determination was based on the absence of any facts or averments in the record regarding exhaustion of administrative remedies with the Commission before filing suit in the district court. As the complainant, Nichols bears responsibility for at least stating in his petition that he has satisfied any preconditions to his lawsuit. Where the complainant has not alleged exhaustion of administrative remedies, a trial court considering motions to dismiss may properly rely on the absence of a showing in making a determination that plaintiff has not exhausted those remedies. Moreover, as the trial court noted, if Nichols has exhausted his administrative remedies without gaining his objective, his recourse would be to file a petition for judicial review of the Commission's actions rather than to file a petition

for an independent lawsuit. Thus, the district court's conclusion that it did not have subject matter of the case filed by Nichols is based on more than his failure to aver exhaustion of administrative remedies.

Nichols also directs the court's attention to his attempt to get the trial court to take judicial notice that he had exhausted administrative remedies.

The record on appeal contains the following exhibits:

Statement of Organization of Kids 1st of JF Cty
Receipts & Expenditures Report of Kids 1st of JF Cty (1996)
Receipts & Expenditures Report of Kids 1st of JF Cty (1997)
Receipts & Expenditures Report of Kids 1st of LV Cty (1996)
Receipts & Expenditures Report of Kids 1st of LV Cty (1997)

The first amended petition in the record on appeal does not have attached to it exhibits lettered after H. In other words, there are no exhibits I, J, K, and L in the record on appeal. None of the exhibits available for examination is evidence of Nichols' exhaustion of administrative remedies.

Nichols next contends that the CFA, as construed by the trial court, is unconstitutional. His position as stated in his brief is: "Under the trial court's unduly narrow reading of CFA, the State putatively restricts all speech and associational rights but [i]s also the sole judge of whether those restrictions will be equally or similarly enforced." Nichols further states: "Providing a civil remedy to the person whose rights are at risk or under jeopardy, under any theory, for CFA violations would avoid constitutional infirmity."

Apparently, Nichols objects to the CFA's imposing limits on his campaign financing without permitting him to enforce CFA limits on his opponent's campaign financing by suing his opponent or her contributors for their alleged violations. Nichols contends that the CFA abridges his freedom of speech and association without furnishing him an adequate substitute remedy for the right infringed.

Nichols would have this court apply the due process concept of a quid pro quo of comprehensive legislation substituting a statutory remedy for one that formerly existed at common law, which is familiar from the statutory scheme of workers compensation, onto statutory provisions limiting political campaign contributions. See

*Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 942 P.2d 591 (1997). The concept does not apply for the simple reason that the legislature was not modifying common law in setting contribution limits in the CFA. Instead, the legislature was creating statutory limitations distinct from any that had existed in common law. The contribution limits established by the CFA did not exist at common law. Hence, there was no common-law remedy for violations of contribution limits that could be supplanted by the statutory scheme.

Nichols also cites *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), and *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988), the holding of which has been overruled in part by *Bair v. Peck*. Neither helps his cause. Both involved statutes that modified common law. In *Bair*, the court held that there was an adequate quid pro quo of comprehensive legislation for statutory abolition of the common-law doctrine of vicarious liability for certain health care providers. 248 Kan. at 844. In *Kansas Malpractice Victims*, the court struck down statutory caps on amounts that could be recovered, no matter how severe the injury or how great the loss. The court found that the injured person entitled to benefits under the statute did not receive a sufficient quid pro quo for the limitation.

Nichols also cites *Buckley v. Valeo*, 424 U.S. 1, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976). The concept of a quid pro quo for loss or limitation of a common-law right is not a part of *Buckley*. The phrase "quid pro quo" appears in the *Buckley* opinion in discussions of the evils Congress sought to eliminate by enacting the Federal Election Campaign Act of 1971 (18 U.S.C. §§ 592 *et seq.* [1994]) rather than as a due process concept.

The majority's decision in *Buckley* does not support Nichols' contention that the CFA contribution limitations are unconstitutional, with or without a private cause of action. The Supreme Court distinguished between the contribution and expenditure provisions of the Federal Campaign Act (Act), striking down the expenditure provisions as First Amendment violations but upholding the contribution limitations. The majority stated: "By contrast with a limitation upon expenditures for political expression, a lim-

itation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." 424 U.S. at 20-21. The Supreme Court majority expressly determined that the Act's contribution limitations "do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties." 424 U.S. at 29. Thus, it concluded that "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms." 424 U.S. at 29.

Nichols next contends that the trial court erred "in holding that there are no facts which could be pled to state a common law tort-based cause of action" for violations of the CFA. He directs the court's attention to Restatement (Second) of Torts § 865 (1977), which provides: "One who by a consciously wrongful act intentionally deprives another of a right to . . . hold public office or seriously interferes with [this right] is subject to liability to the other." Nichols' theory seems to be that the defendants' violations of CFA contribution caps seriously interfered with his right to hold public office so that they are subject to liability to him in tort.

The Restatement, of course, is not a compilation of Kansas law. Thus, when presented with the question of recognizing a cause of action, which is set forth in the Restatement but has not been prosecuted in Kansas courts, this court typically weighs relevant factors and declares either that it is adopting or not adopting a rule set forth in a Restatement section. See, e.g., Cansler v. State, 234 Kan. 554, 564, 675 P.2d 57 (1984). Nichols does not suggest that this court has adopted the rule set forth in Restatement (Second) of Torts § 865. Instead, he seems to assume that the rule is a part of our common law. Nichols' assumption is not borne out in the case law.

Nichols urges the court to fashion a cause of action that combines a tort cause of action based on § 865 with the statutory scheme. He wants the court to create or recognize a tort action that is independent of the CFA but borrows the statute's expression

of the duty of care. He cites *Stradford v. Reinecke*, 6 Ill. App. 2d 537, 128 N.E.2d 588 (1955), as involving an election statute used to establish the standard of duty owed in tort. Stradford, a defeated candidate for state legislature, sued the members of Chicago's Board of Election Commissioners, seeking damages for their failing to preserve the ballots. A jury awarded Stradford $7,500. The appellate court reversed. The appellate court concluded that the election commissioners could be held civilly liable to a defeated candidate for a breach of their statutory duty to preserve the ballots, but refused to impose liability in this case because Stradford had failed to give them notice that he was contesting the election. 6 Ill. App. 2d at 547-48.

One of the contentions of the election commissioners in *Stradford* was that they were under no civil liability to the defeated candidate because there was no statutory provision for liability. 6 Ill. App. 2d at 544. The Illinois appellate court disagreed:

"For more than two centuries courts in countries with a representative form of government have given the highest possible degree of protection to a citizen's right to vote [citation omitted] and, correlatively, to his rights as a candidate for public office [citation omitted]. As early as 1849 by statute in this State a civil remedy for damages was provided to an elector deprived of his right to vote by the neglect or refusal of an election official. [Citation omitted.] Civil liability attached, however, in the absence of any statute where an election official wilfully deprived an elector of his right to vote. [Citation omitted.] For cases in other jurisdictions see, generally, 153 A.L.R. 109 et seq. A civil action for damages has similarly been accorded under our law to a candidate wilfully injured in his candidacy by an election official. [Citations omitted.] See also, Restatement, Torts, sec. 865." 6 Ill. App. 2d at 545.

Nichols also cites *Valdez v. Gonzales*, 50 N.M. 281, 176 P.2d 173 (1946). Like the Illinois court, the New Mexico Supreme Court generally recognized a cause of action for interference with a right to hold office but refused to apply it in the circumstances of the case before it.

In *Valdez*, Tito Valdez, the defeated candidate for school superintendent of Rio Arriba County sued Madrid, the County Clerk, and Gonzales, the Secretary of State. Election officials in three precincts in which Valdez received a substantial majority of votes mailed their poll books in improper envelopes. Because the mailed

poll books did not reach the County Clerk's office within 24 hours after the polls closed, they were not counted. If they had been counted, Valdez would have been the successful candidate. Because they were not, the certificate of election was issued to his opponent. Valdez prosecuted a statutory contest, which was decided against him. His subsequent suit against Madrid and Gonzales was for recovery of the lost superintendent's salary and the cost of prosecuting the statutory contest.

The New Mexico Supreme Court stated two grounds for affirming dismissal of Valdez' action. The first arose from the negligence consisting of words directed to the election officials rather than acts. The New Mexico court considered the principles governing liability for negligent language to third persons and concluded that there was a distinct need to limit liability for negligent language. Another ground on which the motion to dismiss was sustained is that the negligence complained of was not the proximate cause of plaintiff's injury. It merely furnished the condition under which the injury was received but did not put in motion the agency by which the injury was inflicted.

The cases from other states' courts, of course, are not controlling and, at best, may furnish a rationale this court finds persuasive. In this instance, the Illinois and New Mexico cases may serve to illustrate causation problems seemingly inherent in a private cause of action for interference with a right to hold office. None of the cases cited by Nichols are on point or support his argument.

Despite the complete absence of any authority for Kansas courts' adoption of § 865, Nichols devotes a number of pages of his brief to arguments based on his unfounded assumption that there has long been recognized in Kansas courts a common-law tort of interference with a right to hold office. He criticizes defendants for trying to blur the line between a private cause of action under the CFA and a tort action based on a duty expressed in the statute. He seeks to show that the doctrine of exhaustion of administrative remedies has no application to a common-law tort and, conversely, that an administrative agency cannot adjudicate a common-law tort. He argues that the CFA cannot and does not supersede the

common-law tort (which protects constitutional rights) in the absence of an express abrogation and quid pro quo.

He concludes his discussion of this issue, however, with the statement that recognition of the tort of interference with the right to hold office is a matter of first impression in Kansas. Ignoring enforcement provisions of the CFA, Nichols charges that the court's failing to adopt § 865 will place violators of the CFA beyond the reach of the law. We find Nichols' argument has no merit.

Nichols next argues that the trial court erred in holding that there is no private cause of action under the CFA. The trial court followed *Gietzen* in holding that allegations involving violations of the CFA did not give rise to a private cause of action. Gietzen's action was based on a letter sent to voters by Feleciano on the eve of the election. The letter stated that Gietzen had been placed on probation for battery of his first wife and had been divorced by his second wife. Summary judgment was entered in favor of Feleciano in Gietzen's action for libel because Gietzen did not controvert the statements in the letter.

Gietzen also argued that he had a cause of action against Feleciano for distributing the letter on the eve of the election when Gietzen did not have time to rebut it. Feleciano had signed a Statement of Fair Campaign Practices, which was prepared by the Kansas Commission on Governmental Standards and Conduct, containing the following pledges:

"I shall conduct my campaign without the use of vilification, character defamation, whispering campaigns, libel, slander, or scurrilous attacks on any candidate and his or her personal or family life.

. . . .
"I shall refrain from the unfair practice of publicizing campaign material detrimental to my opponent too near election day to permit my opponent's rebuttal." 25 Kan. App. 2d at 489.

Noting that Feleciano's letter probably violated the statement, the Court of Appeals concluded that his breach did not create a cause of action for damages to his opponent. 25 Kan. App. 2d at 490. The Court of Appeals reasoned:

"The statement signed by Senator Feleciano is provided for in K.S.A. 25-4119g. That statute is part of the Campaign Finance Act, K.S.A. 25-4101 *et seq*. There

is nothing in the Campaign Finance Act which provides for the cause of action against one who violates the provisions of the statement of fair campaign practices. The legislature has provided that complaints concerning violations of the campaign finance act may be submitted to the Kansas Commission on Governmental Standards and Conduct, which has a statutory procedure for investigating such complaints. K.S.A. 25-4160; K.S.A. 25- 4161.

"The legislature saw fit to limit the relief from a violation of the campaign pledge to a complaint before the Commission. It did not provide a cause of action for damages in favor of a party aggrieved about a violation, and we will not read one into the statute.

"We hold that the violation of the statement of fair campaign practices by a candidate who has signed and adopted that statement does not give rise to a cause of action for damages in favor of any party who is aggrieved or damaged thereby." 25 Kan. App. 2d at 490.

Nichols would distinguish *Gietzen* on the ground that its holding is limited to alleged transgressions of the Statement of Fair Campaign Practices. Nichols asserts that candidates are not required to sign the Statement and that the CFA contains no enforcement provision for violation of the Statement. He reads *Gietzen* as deciding the question whether the Statement could be privately enforced when it cannot be enforced "through the Commission or any other agency or process."

Nichols misses the mark in arguing that the CFA contains no enforcement measure for a violation of the Statement and that the Court of Appeals heeded that supposed deficiency. The Court of Appeals stated: *"The legislature saw fit to limit the relief from a violation of the campaign pledge to a complaint before the Commission. It did not provide a cause of action for damages in favor of a party aggrieved about a violation, and we will not read one into the statute."* (Emphasis added.) 25 Kan. App. 2d at 490. K.S.A. 25-4160 provides that any person may file "with the commission a verified complaint in writing stating the name of any person to whom or to which the campaign finance act applies who is alleged to have violated *any provision of the campaign finance act,* and which shall set forth the particulars thereof." (Emphasis added.)

Nichols also garbles *Gietzen* in relying on it for the proposition that exhaustion of administrative remedies is not required as a precondition to a lawsuit. The Court of Appeals did not discuss ex-

haustion of administrative remedies as a prerequisite because it concluded that any remedy was administrative.

On another tack, Nichols argues that the two-part test that has been set forth in Kansas cases for determining whether a private cause of action exists under a statute gets differential application depending on whether a violation is susceptible to objective measurement. He contends that the court will not find a private cause of action where there is only a subjective measure of compliance, but will find one where the measure is objective. He urges the court to apply the test to find a private cause of action under the CFA because violations are objectively measurable.

The two-part test is described as follows in *Nora H. Ringler Revocable Family Trust v. Meyer Land and Cattle Co.*, 25 Kan. App. 2d 122, 126, 958 P.2d 1162, *rev. denied* 265 Kan. 886 (1998):

"Whether a private right of action exists under a statute is a question of law. *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 281, 875 P.2d 949 (1994). Generally, Kansas courts have developed a two-part test for determining whether a private right of action is created. First, the party must show that the statute was designed to protect a specific group of people rather than to protect the general public. See *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 340, 918 P.2d 1274 (1996).

"Second, the court must review legislative history in order to determine whether a private right of action was intended. 260 Kan. at 340; see *Jack v. City of Wichita*, 23 Kan. App. 2d 606, 611, 933 P.2d 787 (1997). This two-part test developed in Kansas is similar to that created by the United States Supreme Court when evaluating whether private rights of action are created under federal statutes. See *Cort v. Ash*, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975). The Kansas Supreme Court has noted the similarity between its two-part test and the *Cort* analysis. See *Greenlee v. Board of Clay County Comm'rs*, 241 Kan. 802, 805-06, 740 P.2d 606 (1987)."

In *Ringler*, the Court of Appeals determined first that K.S.A. 1994 Supp. 65-171d, which contained distance requirements that confined livestock feeding facilities must be separated from habitable buildings, was intended to protect a particular class of persons. 25 Kan. App. 2d at 129. On the second question, the Court of Appeals "conclude[d] that the legislature, knowing of KDHE's limited resources and citizens' complaints that small feedlots were causing considerable nuisance problems, intended to allow private citizens to enforce the clear and objective separation distance

requirements included in K.S.A. 1994 Supp. 65-171d by injunctive relief." 25 Kan. App. 2d at 131-32.

Nichols does not discuss whether application of the two-part test actually is called for in the present case. In *Greenlee v. Board of Clay County Comm'rs*, 241 Kan. 802, 740 P.2d 606 (1987), the court made a thorough study of the approach followed by Kansas courts in determining whether the violation of a statute creates a cause of action in favor of an individual. The determination hinges on what the legislature intended. Thus, the first step in the inquiry is to examine the form and language of the statute or, as in this case, the statutory scheme. Examination of the CFA reveals that its provisions may be classified in three categories. The first concerns creation and operation of the Kansas Commission on Governmental Standards and Conduct, which is charged with administration of the CFA. Quite a lot of attention was given by the legislature to details of the appointment and composition of the Commission. It consists of nine members, no more than five from one political party, two appointed by the governor, and one each by the senate president, house speaker, minority leaders of the senate and house, the chief justice, attorney general, and secretary of state. Further legislative attention was expended in setting out what the Commission is authorized and required to do in the course of its operations. See K.S.A. 1999 Supp. 25-4119a. The second category sets out reporting requirements, rules regarding contributions, and prohibited campaign practices. See, *e.g.*, K.S.A. 1999 Supp. 25-4148, K.S.A. 1999 Supp. 25-4153a, and K.S.A. 1999 Supp. 25-4156.

The third category includes a number of provisions providing for the filing of complaints, establishing procedures, and setting penalties for violations of limitations and requirements. K.S.A. 25-4160 and 25-4161 authorize the Commission to entertain complaints filed by individuals, to investigate complaints and make probable cause determinations, conduct hearings, and to notify the attorney general of violations of criminal laws or laws not administered by the Commission. K.S.A. 25-4163 provides the process to be followed by the Commission in its determination of complaints. Hearings are open to the public. The Commission is given the power

to administer oaths and subpoena power, which is enforceable in contempt proceedings in district court. The parties to the proceedings have "the right to be represented by legal counsel, to call and examine witnesses, to introduce evidence and to cross-examine opposing witnesses." K.S.A. 25-4163(b)(2). Under K.S.A. 25-4164, "[i]f the commission finds that the respondent has violated any provisions of the campaign finance act, it shall state its findings of fact and submit a report thereon to the attorney general and to the county or district attorney of the appropriate county." K.S.A. 1999 Supp. 25-4152(a) creates a civil penalty of $10 per day for each day that registration and reporting requirements remain unfulfilled. Subsection (c) of 25-4152 charges the Commission with the duty of filing a district court action to recover any unpaid penalty. K.S.A. 1999 Supp. 25-4156(b)(2) makes corrupt political advertising a misdemeanor. K.S.A. 1999 Supp. 25-4167 makes failing to file a campaign finance report a misdemeanor. K.S.A. 1999 Supp. 25-4169a prohibits use of public funds and equipment to aid or advocate a candidate and makes violation of the prohibition a misdemeanor. Finally, K.S.A. 1999 Supp. 25-4181 provides:

"(a) The commission, in addition to any other penalty prescribed under the campaign finance act, may assess a civil fine, after proper notice and an opportunity to be heard, against any person for a violation of the campaign finance act in an amount not to exceed $5,000 for the first violation, $10,000 for the second violation and $15,000 for the third violation and for each subsequent violation. Whenever any civil fine or penalty is proposed to be assessed against the treasurer of any candidate who is not also the candidate, such notice shall be given to both the treasurer and the candidate prior to the assessment of such fine or penalty. All fines assessed and collected under this section shall be remitted promptly to the state treasurer. Upon receipt thereof, the state treasurer shall deposit the entire amount in the state treasury and credit it to the governmental ethics commission fee fund.

"(b) No individual who has failed to pay any civil penalty or civil fine assessed, or failed to file any report required to be filed under the campaign finance act, unless such penalty or fine has been waived or is under appeal, shall be eligible to become a candidate for state office or local office until such penalty or fine has been paid or such report has been filed or both such penalty or fine has been paid and such report filed."

It is apparent that the legislature designed a comprehensive scheme for enforcement of the CFA. The scheme provides for

actions to be filed in the district courts upon referral from the Commission or upon completion of the Commission's procedures. In *Gietzen*, the Court of Appeals concluded that "[t]he legislature saw fit to limit the relief from a violation of the campaign pledge to a complaint before the Commission. It did not provide a cause of action for damages in favor of a party aggrieved about a violation, and we will not read one into the statute." 25 Kan. App. 2d at 490. In this case involving alleged campaign contribution violations, too, the only reasonable conclusion that can be drawn is that the legislature intended for alleged violations of the CFA to be processed by the Commission.

The two-part test, which amounts to a formula for ascertaining legislative intent, is superfluous in these circumstances. A brief discussion of its application to Nichols' allegations of CFA violations, though, will show that its result conforms to the conclusion already reached. We begin with the question whether the statutes were designed to protect a specific group of people rather than to protect the general public. Nichols claims that the CFA was enacted with the dual purpose of protecting political candidates and the public from campaign irregularities. Nichols further contends that as a political candidate, he was a member of the specific group of people the CFA was designed to protect. In support, he quotes this court's statement that the CFA is designed to prevent "unscrupulous persons and organizations from contributing unlimited sums of money in order to obtain improper influence over candidates for elective office or to affect the outcome of elections." *State v. Palmer*, 248 Kan. 681, 699, 810 P.2d 734 (1991). Defendants quote the same passage to support their contention that the purpose of the CFA is to protect the public.

The court's statement lends more support to the defendants' contention than to Nichols'. Preventing the "buying" of candidates and manipulation of election outcomes is a matter of foremost concern for the public that will be governed by the officeholders. A political candidate running against someone who is backed by unscrupulous contributors may incidentally benefit from the protections offered by the CFA, but the full-blown and intended benefit belongs to the public.

The second part of the test requires examination of the legislative history. Appellant has not furnished documents of legislative history for the court's consideration. The plain scheme of the CFA, however, makes resort to history of its enactment unnecessary.

At the heart of Nichols' quarrel with the district court's decision is his belief that the actions of the defendants deprived *him* of his office so that it is fundamentally unfair to preclude him from effecting *personal* redress. He states in his brief: "Just because the town bully is prosecuted, convicted and then punished for the assault does not absolve that same bully from civil liability [to the victim] for rendering the beating." The flaw in his analogy illustrates why his arguments are unavailing—the personal injury wrong perpetrated by the bully was recognized at common law, but the wrong allegedly perpetrated by the present defendants became a wrong only when the legislature made it so. The statutorily created wrong is to be remedied in the manner prescribed by the legislature, which in the case of the CFA is via a complaint filed with the Commission.

Nichols also directs the court's attention to K.S.A. 25-4161, which provides that neither the filing nor the allegations of a complaint will be made public by the Commission except and until the Commission's investigation reveals that probable cause exists for believing the allegations of the complaint. K.S.A. 25-4161(b) and (e). His point with regard to the confidentiality provisions seems to be that a complaint dismissed for lack of probable cause will never be publicly disclosed, thus "prevent[ing] the complainant from alleging or proving the complaint even in an effort to appeal from the Commission's action." Assuming for the sake of this argument that Nichols' construction of the statute is accurate, he nonetheless fails to take into account the possibility of a sealed record or some other means of preserving confidentiality in the reviewing court. Thus, for the purpose of this appeal, Nichols has not pointed out an aspect of the CFA's procedure that outweighs all the factors indicating no private cause of action.

As for his cause of action based on fraud, Nichols alleged that the CFA placed a legal duty on defendants "to disclose truthful, complete and accurate information about their efforts to support

or oppose a candidate for state office." He further alleged that defendants breached their legal duty to so disclose and that their actions were intended to and did harm him.

The district court expressed the view that, like Nichols' other claims, the claim for fraud stems from alleged violations of the CFA. His remedy, therefore, is an administrative one. The district court further stated that even if Nichols had a private cause of action for fraud, he failed to plead fraud with sufficient particularity and he failed to allege any facts that might show reliance.

We agree that what is patently missing from Nichols' pleading of fraud is any allegation of reliance. It is a familiar rule in Kansas courts that a plaintiff must show his or her reliance on the disputed communications and resulting detriment in order to establish fraud by omission or commission. *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 260, 978 P.2d 922 (1999); *Todd v. Wichita Federal Savings & Loan Ass'n*, 184 Kan. 492, 494, 337 P.2d 648 (1959). In *Todd*, the court affirmed the district court's sustaining the demurrer on the following ground:

"It is an elementary rule of the law of fraud, regardless of the form of relief sought, that in order to secure redress because of false representations it is not enough to show merely that they were material, that they were known to be false and that they were made with intent to deceive, but it must also be shown that they did actually mislead and deceive, or, in other words, that they were relied upon by the complaining party to his detriment. Where a plaintiff seeks to recover because of the fraud of the defendants, based upon false representations, it is incumbent upon him to allege and prove what representations were made, that they were false, that he believed them to be true, and that he relied and acted upon them to his detriment." 184 Kan. at 494.

In this case, Nichols did not expressly state that he relied to his detriment on defendants' filings or failing to file. Nor can it be inferred from his allegations that he relied on them. In this case, the communications Nichols complains of were supposed to be made to the Commission rather than to him. He alleged only that he was a member of the class "to whom the protections of benefits of Kansas' Campaign Finance Act was enacted to protect." He did not allege that he reviewed the defendants' communications or that he was unable to review the communications defendants failed to

file. He in no way links his conduct to defendants' communications with the Commission. There is nothing in the first amended petition from which it can be said that Nichols acted in reliance on defendants' filings or failings. Nichols has no separate action for fraud.

Nichols next argues that the district court should have rendered a declaratory judgment regardless whether he had exhausted administrative remedies. He relies on K.S.A. 60-257 which provides in part: "The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." In his words, "[i]n all cases, the exhaustion of administrative remedies argument is a red herring." Without deciding the question for "all cases," it certainly is a red herring in the present case.

The principal ground on which the district court dismissed Nichols' action was that all counts involved alleged violations of the CFA, which implies no private cause of action. There is no private right of action under the CFA, but there is a fully articulated administrative procedure for the Commission's receiving, investigating, deciding, and referring privately filed complaints. The CFA further provides that any person aggrieved by any order of the Commission "may appeal such order in accordance with the provisions of the act for judicial review and civil enforcement of agency actions." K.S.A. 25-4185. In dismissing Nichols' action, the district court stated that the procedure he should have followed is the one spelled out in the CFA and that any action he filed in the district court should have been for review of a Commission order rather than for adjudication in the first instance of alleged violations of the CFA. It was in this context that the district court referred to Nichols' failure to exhaust administrative remedies.

In Count I of his first amended petition, Nichols requested the district court to declare that alleged actions of defendants violate provisions of the CFA. The basis for the district court's dismissal was that a private right of action is not implied by the CFA. Thus, declaratory judgment was precluded not by the existence of another remedy but, instead, because this is not an appropriate case for declaratory relief.

Last, Nichols argues that the trial court erred in dismissing his civil conspiracy claim. Nichols' conspiracy theory, like all his other claims, was based on violations of the CFA. In his own words, "[i]f any civil theory survives the trial court's ruling, from fraud to tort to private right of action, then the count in civil conspiracy also survives." For all the reasons already stated, the district court did not err in dismissing the conspiracy claim.

The judgment of the district court is affirmed.