NOT DESIGNATED FOR PUBLICATION

No. 115,088

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SUE ANN JONES,
*Appellee*,

v.

COMMUNITY BANK OF WICHITA
*Defendant*,

and

JAN COLVIN and ROBERT COLVIN,
*Appellants*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TIMOTHY H. HENDERSON, judge. Opinion filed March 3, 2017. Reversed.

*Steven R. Smith*, of Gates Shields Ferguson Hammond, P.A., of Overland Park, for appellants.

*Matthew A. Spahn*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee.

Before BRUNS, P.J., MCANANY and BUSER, JJ.

*Per Curiam*:  This action arises out of an unfortunate dispute between sisters Jan Colvin and Sue Ann Jones after the death of their mother, Patricia Robinson. Jan is married to Robert Colvin. She and Robert were the sole members of Fairchild Interiors and Design, L.L.C., which engaged in retail furniture sales and interior design in Wichita. The Wichita shop was Jan's dream since she was 14 years old. Her sister, Sue Ann, worked with her at this store.

1

In August 2009, Patricia Robinson invested in a $200,000 certificate of deposit issued by the Community Bank of Wichita (Community Bank). The CD was issued to Patricia and Jan in joint tenancy. Sue Ann had no interest in the CD. The CD was obtained in order to provide security for a $250,100 loan issued by the Community Bank in August 2009 to Robert and Jan to finance their store in Wichita. The assignment of the CD to the Community Bank provided that one of the conditions of default would be the Community Bank's determination that payment of the loan was impaired for any reason. Along with the pledged CD, repayment of the loan was personally guaranteed by Robert. In December 2009, the shop opened for business in Wichita.

In April 2010, Patricia died. Her daughters, Jan and Sue Ann, were her sole heirs. With Patricia's death, Jan became the sole surviving owner of the CD pledged to the Community Bank.

Patricia's estate included a $6,531.38 checking account at Guaranty Bank and Trust Company of Denver, Colorado (Guaranty Bank). The account was payable upon death to Sue Ann and Jan. In May 2010, Robert contacted Guaranty Bank about the account. He was told that Sue Ann and Jan would have to provide written and notarized instructions before the funds could be disbursed. Upon receiving these instructions, the Guaranty Bank, after deducting a social security payment to Patricia for the month of her death, transferred the $4,864.38 net balance in Patricia's account to the Colvins' checking account.

Sue Ann did not receive any of the proceeds from this account. Sue Ann would later contend at trial that she did not sign the authorization for this transfer. To the contrary, Jan testified at trial that both she and Sue Ann signed the notarized letter authorizing the transfer. Sue Ann testified that these funds were supposed to be used to pay her mother's final bills, but not all of these expenses were paid. An American Express bill, a headstone bill, and medical expenses remained unpaid. But she did not present any

2

evidence that these funds were used to pay something other than her mother's final expenses.

Shortly after Patricia's death, Robert prepared an accounting of the assets in Patricia's estate. Both Jan and Sue Ann received copies. The accounting provided that Jan and Sue Ann were each entitled to a $100,000 CD at the Community Bank. The accounting also provided that the funds from Patricia's account held in the Colvins' checking account would be used to partially satisfy Patricia's outstanding debts.

According to Sue Ann, Robert claimed that she and Jan individually owned separate $100,000 CDs. There never were separate $100,000 CDs, just the single $200,000 CD pledged to the Community Bank. Robert testified that the accounting statement was not intended to falsely represent that two separate CDs existed. Rather, the accounting statement "was meant to show that it was [$100,000] that would have been for each person."

In October 2010, Jan made a $100,000 gift to Sue Ann by adding Sue Ann as a joint owner of the $200,000 CD pledged to the Community Bank. Sue Ann signed an assignment agreement of the CD in which she acknowledged that the CD was pledged as collateral for the Fairchild loan. Sue Ann also signed a third-party agreement which stated that her interest in the CD could be used to satisfy the Fairchild loan.

> "I agree to give you a security interest in the Property that is described in the Security Agreement section. I agree to the terms of this Loan Agreement, but I am in no way personally liable for payment of the debt. This means that if the Borrower defaults, my interest in the secured Property may be used to satisfy the Borrower's debt."

Sue Ann conceded that the CD was collateral for the loan and, in the event of default, its proceeds could be used to satisfy any outstanding loan balance. She understood she

3

would be entitled to her half of the CD only when the CD was no longer pledged as collateral for the loan.

Fairchild's Wichita store proved not to be profitable. The housing crisis that followed the beginning of the Great Recession in 2008 adversely affected the business. "[T]he store wasn't making any money. It made money about one of the 24 months we were open."

In October 2010, Robert was in the process of seeking an SBA loan through the government's SKID loan process. He hoped to obtain a new loan with a longer payout. Fairchild was making interest-only payments on the Community Bank note. "[W]e weren't able to pay down any principle [*sic*] on the note." In December 2010, Robert sent Sue Ann an email in which he discussed the Community Bank loan, the store's inadequate financial performance, and his hope to refinance the loan.

In January 2011, Robert met with the Community Bank to discuss Fairchild's financial performance. Fairchild's 2010 third quarter had been "decent," but the "Christmas season wasn't what [he] thought it was going to be." Robert and the Community Bank had numerous discussions regarding solutions for paying off the loan. Sue Ann was not a party to any of these discussions. Robert told Community Bank that the SKID loan had been approved, but not for enough to retire Fairchild's note to Community Bank. Robert told the Community Bank that "I would not be able to make the principle [*sic*] payment when the note came due in March." No solution was found so the Community Bank called the loan, liquidated the CD, and applied the $200,000 proceeds to the loan, leaving an unpaid balance of about $50,000.

The Colvins ultimately consolidated this remaining $50,000 loan balance with another outstanding loan from the Community Bank, leaving a total loan balance of $102,187.57. This loan was renewed by the Community Bank with a $79,761.31 balance.

4

The renewal note remained unpaid, and the Community Bank is currently suing Robert on this note.

The Fairchild Company closed the Wichita store in September 2011. Sue Ann later purchased the name of the failed business and opened her own design firm in Augusta, named Fairchild Interiors and Design. Sue Ann testified that not receiving a share of the $200,000 CD did not impede her ability to open the new shop.

Sue Ann learned of these events in February 2012. She would later contend that Community Bank's calling the loan and liquidating the CD was prompted and encouraged by Robert. Robert denied this claim and contended that he was working hard to refinance the loan in order to "buy more time for the company."

In January 2013, Sue Ann filed suit against Community Bank, Robert, and Jan. The Colvins retained counsel to defend against Sue Ann's claims. Sue Ann's claims included a claim of fraud against Robert. Robert denied any fraud and moved the court to dismiss this claim for failure to plead the fraud claim with particularity and failure to show detrimental reliance. Sue Ann responded that the fraud consisted of Robert directing the Community Bank to apply the CD's proceeds to the loan balance. The district court overruled Robert's motion to dismiss.

In August 2014, the court granted the motion of the Colvins' attorney for leave to withdraw as their counsel. From that point forward, including the jury trial, the Colvins proceeded pro se.

In May 2015, the court issued an agreed pretrial order in which Sue Ann contended that Community Bank liquidated the CD at Robert's direction and applied its proceeds to the outstanding loan balance. She claimed that Robert's actions constituted fraud, breach of duty, negligence, and unjust enrichment by "paying down" the Fairchild

5

loan. She also claimed a civil conspiracy between the Community Bank and the Colvins to liquidate the CD and apply its proceeds to the outstanding loan balance and that the Colvins aided and abetted Community Bank in converting the CD. She claimed damages of $200,000 but did not allege any specific harm. Sue Ann settled her claims against the Community Bank before trial.

Sue Ann also claimed that Jan forged her name on the letter instructing the Guaranty Bank to transfer their mother's remaining checking account funds to the Colvins. Sue Ann asserted that she did not consent to, or sign, the letter. Sue Ann claimed that she sustained $6,531.38 in damages as a result of Jan's actions.

Robert moved for summary judgment. The district court denied his motion in October 2015.

Following a jury trial in November 2015, and the return of the jury's verdict, the district court entered judgment against Robert in the sum of $100,000 on Sue Ann's theories of unjust enrichment, conversion, fraud, civil conspiracy, and aiding and abetting. Interestingly, the court entered no judgment in favor of Sue Ann on her negligence claim, notwithstanding the jury's finding that Robert was 90% negligent in the transaction.

The court entered judgment against Jan in the sum of $2,432.19 on Sue Ann's claim of conversion. This appeal followed.

In this appeal, the Colvins raise issues regarding the district court's denial of their motion for judgment on the pleadings, the district court's denial of Robert's summary judgment motion, and the district court's failure to make findings and conclusions in denying Robert's summary judgment motion. But these issues are subsumed into the

6

overriding issue of whether the district court erred in submitting Sue Ann's claims to the jury.

As conceded in oral argument before us, the current claim on appeal that Sue Ann's claims should not have been submitted to the jury is the equivalent of arguing that the evidence educed at trial was insufficient to support the jury's verdicts on the various counts. The sufficiency of the evidence is a matter which we may consider on appeal regardless of whether it was raised before the trial court. See *Alford Ranches, LLC v. TGC Indus., Inc.*, No. 112,375, 2015 WL 9591354, at *8 (Kan. App. 2015) (unpublished opinion) (citing *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 [2008]). In considering the sufficiency of the evidence to support Sue Ann's various claims, we do not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, considered in the light favoring Sue Ann, supports the verdict, we will not disturb it on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011). In doing so, we consider uncontroverted evidence of Robert and Jan. See *Walborn v. Stockman*, 10 Kan. App. 2d 597, 600, 706 P.2d 465 (1985) ("[A] factfinder cannot disregard uncontroverted and unimpeached testimony or the only evidence upon a material question in controversy and return a verdict in direct opposition.").

*Fraud*

With respect to Sue Ann's fraud claims, our Supreme Court stated in *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191 (2004): "The elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment." Thus, a cause of action for fraud requires proof of the following five elements:

7

"(1) The defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations; (5) the other party sustained damages by relying upon the representations." *Stechschulte v. Jennings*, 297 Kan. 2, 19, 298 P.3d 1083 (2013).

In accord is our civil pattern instruction, PIK Civ. 4th 127.40, which identifies the essential elements required to sustain a fraud claim:

"1. That false (or untrue) representations were made as a statement of existing and material fact.

"2. That the representations were known to be false (or untrue) by the party making them, or were recklessly made without knowledge concerning them.

"3. That the representations were intentionally made for the purpose of inducing another party to act upon them.

"4. That the other party reasonably relied and acted upon the representations made.

"5. That the other party sustained damage by relying upon them."

Sue Ann asserted a claim for fraud against Robert based upon the following:

- Jan and Sue Ann were owners of a $200,000 CD held with Community Bank.
- The Colvins, as managing members of Fairfield Interiors, signed an assignment of the CD.
- Sue Ann signed the assignment and was listed as a secured party.
- The assignment specifically listed the CD as collateral for the loan.
- On January 21, 2011, Robert directed Community Bank to liquidate the CD and apply its proceeds to loan's outstanding balance.
- Neither Community Bank nor the Colvins notified Sue Ann in writing that the CD's proceeds were applied to the loan's outstanding balance.
- Sue Ann did not authorize liquidation of the CD.

8

- Robert did not have any ownership interest in the CD.
- Sue Ann suffered $200,000 in damages as a result of Robert's actions.

Based on our review of the trial transcript, with respect to Robert's dealings with the Community Bank, we find no evidence of a false statement that encouraged the Community Bank to liquidate the CD and apply the proceeds to the loan balance. Indeed, Sue Ann does not even allege that a false statement was made in this transaction. Robert testified that the store was not profitable, having made money only 1 month out of 24. The housing industry was greatly affected by the recession during this period. Robert sought to refinance the debt through the SBA but was unable to obtain a loan that would pay off the outstanding loan. Community Bank was receiving interest-only payments on the loan, and it was clear that the borrower would not be able to pay down the principal when the note became due. Sue Ann does not challenge the truth of any of these representations.

Besides, these representations were to the Community Bank, not to Sue Ann. As the plaintiff, it was her burden to present evidence that she acted upon some materially false statement by Robert to her detriment. An essential element of actionable fraud is the plaintiff's reliance on a false statement to his or her detriment. *Nichols v. Kansas Political Action Comm.*, 270 Kan. 37, 53, 11 P.3d 1134 (2000).

> "'It is an elementary rule of the law of fraud, regardless of the form of relief sought, that in order to secure redress because of false representations it is not enough to show merely that they were material, that they were known to be false and that they were made with intent to deceive, but it must also be shown that they did actually mislead and deceive, or, in other words, that they were relied upon by the complaining party to his detriment. Where a plaintiff seeks to recover because of the fraud of the defendants, based upon false representations, it is incumbent upon him to allege and prove what representations were made, that they were false, that he believed them to be true, and that he relied and acted upon them to his detriment.' [Citation omitted.]" 270 Kan. at 53.

9

The only claimed misrepresentation from Robert to Sue Ann was Robert's assertion in the email that there were two separate $100,000 CDs, rather than one $200,000 CD. Sue Ann fails to establish that this misstatement was material. But more importantly, she alleges no detrimental reliance on this claimed misstatement. There is no evidence whatsoever about actions she took or acts she refrained from engaging in on account of this representation by Robert. Without some evidence of detrimental reliance, there was insufficient evidence to support Sue Ann's claim of fraud.

Sue Ann's interest in the CD was a gift from her sister, Jan. At the time of the gift, and throughout the remainder of the events leading to this fraud claim, the CD was pledged as security for the Community Bank's loan. As noted earlier, Sue Ann conceded that the CD was collateral for the loan and, in the event of default, its proceeds could be used to satisfy any outstanding loan balance. She understood she would be entitled to her half of the CD only when the CD was no longer pledged as collateral for the loan. The loan secured by the CD was in the principal amount of $250,100. During the life of the loan, no payments were ever made to reduce the principal balance. Thus, at all times during the life of the loan the loan balance which encumbered the CD exceeded the value of the $200,000 CD.

The CD had no net equity value so long as it was subject to the Community Bank's security interest. There is no evidence to dispute Robert's testimony regarding the failure of the business. There is no dispute that the note was scheduled to come due 2 months after the Community Bank's action. Further, there is no evidence that Robert or Fairchild had the ability to pay off the note when due, to avoid the inevitable foreclosure of the collateral and to free the CD from the Community Bank's security interest so as to give the CD value in the hands of Jan and Sue Ann. In other words, there is no evidence that but for Robert's actions, Sue Ann would have realized any proceeds from the CD.

10

To the contrary, the evidence was that after the CD was liquidated and the proceeds applied to the loan, there remained an unpaid balance of about $50,000. This remaining balance was consolidated with another outstanding loan into a $102,187.57 loan. This loan was reduced to a $79,761.31 balance but never satisfied, resulting in the current suit by the Community Bank against Robert on this note. With this undisputed evidence, it is apparent that the original Community Bank promissory note would not have been paid off so as to eliminate the security interest against it and to permit Sue Ann to enjoy any proceeds from the CD. The CD had no real value until that happened. Thus, Sue Ann fails to show that she sustained any damages as a result of the claimed fraudulent conduct of Robert.

*Conversion*

Sue Ann also asserted claims of conversion against both Robert and Jan. The conversion claim against Robert arises out of the Community Bank's liquidation of the CD and applying the proceeds to the outstanding loan. The conversion claim against Jan arises out of the disposition of the proceeds from her mother's account at the Guaranty Bank in Denver.

Conversion is the "'unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 22, 378 P.3d 1090 (2016). As stated in PIK Civ. 4th 124.81, "The measure of damages for conversion of personal property is the fair and reasonable market value of the property converted at the time of the conversion." See *Nelson v. Hy-Grade Construction & Materials, Inc.*, 215 Kan. 631, 635, 527 P.2d 1059 (1974). As noted above, at the time the Community Bank liquidated the CD and applied the proceeds to the loan, the CD had no net value. It was pledged to secure the loan, and the loan balance at all times exceeded the value of the loan. Sue Ann failed to establish any damages on her conversion claim against Robert.

11

With respect to Sue Ann's conversion claim against her sister, Jan was a co-recipient of this payable-on-death account. The uncontradicted evidence was that the money was supposed to be used to pay their mother's final expenses. Sue Ann testified that there remained unpaid an American Express bill, a headstone bill, and medical expenses. Sue Ann conceded that her mother's funeral expenses were paid, albeit rather late. Given the relatively paltry sum received from the Guaranty Bank, it is hardly unexpected that some final expenses remained unpaid.

But there is no evidence that the funds in Jan's hands were used to pay something other than their mother's final expenses. There is no evidence that Sue Ann's share of her mother's estate was diminished by Jan's actions. There is no evidence that claims were made against their mother's estate for expenses that Jan should have paid out of the funds she received from Guaranty Bank. There is no evidence that Sue Ann paid expenses that Jan should have paid out of the Guaranty Bank account proceeds. The only evidence is that Jan honored the intent of the sisters to apply the Guaranty Bank proceeds to their mother's final expenses. Without a contrary showing we fail to find sufficient evidence in the record to support the judgment against Jan for conversion.

*Unjust Enrichment*

The court also entered judgment against Robert on the theory of unjust enrichment. Unjust enrichment arises when (1) a benefit has been conferred upon the defendant, (2) the defendant retains the benefit, and (3) under the circumstances, the defendant's retention of the benefit is unjust. *Estate of Draper v. Bank of Am., N.A.*, 288 Kan. 510, 518, 205 P.3d 698 (2009). Sue Ann claims Robert was unjustly enriched when he caused the Community Bank to foreclose on the collateral, thereby reducing his exposure on the loan which he personally guaranteed. But when viewed in the context of the facts surrounding this loan transaction, it is apparent that calling the note and

liquidating the collateral was inevitable. Thus, we are satisfied that the evidence was insufficient to establish that Robert was unjustly enriched.

It is clear from the uncontradicted evidence that foreclosure on the collateral was inevitable. In January 2011, Robert met with the Community Bank to discuss Fairchild's financial performance. Fairchild's 2010 third quarter had been "decent," but the "Christmas season wasn't what [he] thought it was going to be." Robert told Community Bank that the SKID loan had been approved, but not for enough to retire Fairchild's note to Community Bank. Robert told the Community Bank that "I would not be able to make the principle [*sic*] payment when the note came due in March." There was no evidence that Fairchild or Robert had the wherewithal to pay the note when due. Calling the note and foreclosing on the collateral clearly was inevitable. Robert would have received the claimed benefit from foreclosure of the collateral regardless of how that foreclosure came about. Based on these uncontroverted facts, we conclude that there was no evidence to support a judgment for unjust enrichment.

*Civil Conspiracy*

Sue Ann obtained a judgment against Robert based on the theory that Robert engaged in a civil conspiracy with the Community Bank in foreclosing on the collateral. The elements of civil conspiracy are:

> "'(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.' [Citation omitted.] Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy." *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984) (quoting *Citizens State Bank v. Gilmore*, 226 Kan. 662, Syl. ¶ 7, 603 P.2d 605 [1979]).

13

Viewing the evidence in the light favoring Sue Ann, the prevailing party, there still remains no evidence of any damages suffered as a result of Robert's claimed conduct. Without this, the evidence is insufficient to support a verdict based on a civil conspiracy.

*Aiding and Abetting*

The elements of civil aiding and abetting are:

"'(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.'" *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 936, 811 P.2d 1220 (1991).

"A civil conspiracy involves an agreement to participate in a wrongful activity, while aiding and abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct." 248 Kan. at 936.

Sue Ann failed to present any evidence that the Community Bank engaged in wrongful conduct. Regardless whether Robert induced the Guaranty Bank to call the note and foreclose on the collateral, the assignment of the CD provided that one of the conditions of default would be the Community Bank's determination that payment of the loan was impaired for any reason. It is clear from the uncontradicted evidence that the Community Bank's position was impaired by the borrower's inability to meet any of its principal payment obligations and the uncontroverted fact that the borrower would be unable to satisfy the loan when it came due a short time later. Further, there was no showing that the guarantor had the ability to meet his obligation under the guaranty.

Finally, an action based on aiding and abetting requires a showing of damages. Aiding and abetting requires a wrongful act that causes injury. As demonstrated above,

14

there is no evidence of injury or damages to support a claim of aiding and abetting. Accordingly, there is insufficient evidence to support a judgment against Robert on this theory of liability.

*Conclusion*

Based on the analysis above, the remaining claims by Robert and Jan on appeal are now moot, and we need not address them. There being insufficient evidence to support the judgments rendered against Robert and Jan in this matter, all those judgments are reversed.

Reversed.