No. 90,511

BRENT E. PULLEN, *Appellant*, v. MILO M. WEST, LAURA WEST, SHANE KREHBIEL, and BRIAN WEST, *Appellees*.

(92 P.3d 584)

Opinion filed June 25, 2004.

*Ray E. Simmons*, of Ayesh Law Offices, of Wichita, argued the cause, and *Mark G. Ayesh*, of the same firm, was with him on the briefs for appellant.

*Craig Kennedy*, of Johnson, Kennedy, Dahl & Willis, of Wichita, was on the brief for appellee Brian West.

*Troy W. Purinton*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause and was on the brief for appellee Shane Krehbiel.

*Don D. Gribble, II*, of Hite, Fanning & Honeyman L.L.P., of Wichita, argued the cause, and *Vince P. Wheeler*, of the same firm, was with him on the brief for appellees Milo M. West and Laura West.

The opinion of the court was delivered by

DAVIS, J.: This is an appeal from a personal injury action brought against the defendants for injuries the plaintiff sustained during a 4th of July fireworks display at the defendants' home. The plaintiff contends that the district court should have applied the doctrines of strict liability and negligence per se, that the court improperly

excluded expert and lay opinion testimony, and that the trial court erred in excluding certain rules and regulations relating to the type of fireworks display that caused the plaintiff's injuries. The jury returned a verdict finding the plaintiff 92% at fault. This court has jurisdiction by transfer on its own motion pursuant to K.S.A. 20-3018(c).

On July 4, 2001, a party was held at the residence of defendants Milo and Laura West. Their son, defendant Brian West, and defendant Shane Krehbiel, co-hosted the party. The plaintiff, Brent Pullen, was among the invited guests; he knew that a fireworks display was planned, but he was not planning to assist with the display.

Pullen assisted Krehbiel in bringing some of the fireworks in his own truck, arriving at the party between 2 and 3 p.m. Before the fireworks display, Brian West observed Krehbiel and Pullen shooting some of the fireworks, trying to blow up a tree root. Pullen estimated that he had consumed 6 to 8 beers and half of a pina colada during the course of the party. Following Pullen's injury, his blood alcohol level was found to be .144, which according to his own toxicology expert would be more consistent with the consumption of 12 to 16 beers.

Krehbiel supplied the fireworks and was in control of the fireworks display. Later that evening, he asked several people at the party to assist him in shooting off the fireworks, but he denied that Pullen was among those recruited. Although Milo denied recruiting anyone to help with the display, Pullen testified that Milo asked him to help with the display.

Pullen further testified that Milo and Krehbiel instructed those assisting in the fireworks display. According to the plaintiff, Milo identified the fireworks to be used that night and told them where to put the 30-gallon barrels designed to hold the mortar cylinders used to launch the night works display. Pullen also testified that Milo told them not to drink alcohol while shooting off the fireworks. Milo, Brian West, Krehbiel, Stuart Peters, and Lance James all testified that Milo did not participate in the giving of these instructions, nor did he participate in supervising the fireworks display.

Pullen testified that Krehbiel instructed the shooters to verify that the firework was sitting firmly in the mortar tube, to twist the fuses together when lighting more than one firework at a time, and to back off about 10 to 15 feet from the barrel after lighting the fuses. Krehbiel provided him with a cigar to light the fuses, but Pullen was not provided with any safety equipment to use during the display. Krehbiel testified that he told the shooters not to drink while shooting off fireworks.

The fireworks shot during the display were commercial class B fireworks, which do not include consumer fireworks used by the general public. Because of the powerful explosive nature of class B fireworks, certain precautions recommended by rules and regulations adopted in Kansas must be taken in the display of such fireworks. These rules and regulations concern an important issue in this case and are more fully discussed within the opinion.

The fireworks were launched from three 30-gallon barrels which were filled ⅔ up with dirt. Three mortar tubes (paper and PVC plastic) were buried in each of the barrels. The first and third barrels accommodated 3-and 4-inch mortars, and the middle barrel accommodated 3-, 4-, and 6-inch mortars. Krehbiel estimated that each of the mortar tubes were used for 75 to 100 launchings the evening of the fireworks display. The barrels were set up about 20 yards from the house and about 15 yards apart. Hugh Castillo and Lance James manned the first barrel, Krehbiel manned the middle barrel, and Stuart Peters and Pullen manned the third barrel.

Pullen had assisted in lighting fireworks during the 90-minute fireworks display without incident. Krehbiel then said, "Stop, everybody stop," in anticipation of preparing a "cake" or special firework display that would serve as the grand finale. Six to 10 seconds later, Krehbiel heard a firework go off and saw Pullen on the ground about a foot from the 30-gallon barrel Pullen was using to fire off the mortars.

Lance James testified that Pullen was about 3 feet from the barrel. Stuart Peters watched Pullen light the fireworks, saw a flash, and then saw Pullen "get kicked up" and fall over by the barrel. Hugo Castillo testified that Pullen lit the fireworks while standing up and then fell flat down next to the barrel. The county 911 di-

rector, who went to the accident scene, observed Pullen lying 3 to 4 feet from the barrel.

Pullen testified that after he lit three fireworks in the barrel, he backed up 10 to 15 feet and was hit by a firework. At the time of his injury, an explosion or flash went off around roof level of the house. Pullen was taken to the hospital and as a result of his injury, he was blinded in one eye, suffered nerve damage, memory loss, and required steel plates to be inserted in his head.

Pullen's father testified that during a conversation at the hospital with Milo, Milo told him the launching tube used by the plaintiff was deformed because it had a bulge and was split open, causing a misfire in the tube. Pullen's mother testified that Krehbiel and Brian West told her one of the launching tubes in Pullen's barrel was bulged and melted, which caused the accident. Pullen's uncle also testified that Krehbiel had told him the launching tube used by Pullen had a hole in it.

Krehbiel testified that he examined the launching tubes in Pullen's barrel and noted that they were a little deformed or melted at the very top, but the tubes were not blown out so as to cause misfire. On July 5, 2001, Brian West took the launching tubes from Pullen's barrel in order to protect himself. Three launching tubes were admitted into evidence at trial.

Pullen's second amended petition alleged the defendants were negligent in their duties to him as an invitee and a licensee and under the doctrine of strict liability. In the pretrial orders, the trial court refused to apply the doctrines of strict liability and negligence per se. The trial court also prohibited any mention of the rules and regulations regarding class B fireworks displays by Pullen's expert, opinions as to causation by that same expert, and any opinions regarding the number of times certain launching tubes may have been used.

The jury was instructed under a negligence theory. PIK instructions relating to the duty owed by an owner or occupier of land, the duty of an injured party, and the duty of one in possession or control of an exceptionally dangerous instrumentality were given to the jury. See PIK Civ. 3d 126.02, 126.70, 126.81. The jury assessed 92% of the fault to Pullen and the remaining 8% of the fault

to Krehbiel. Additional facts necessary to resolve the issues in this appeal are set forth in the opinion.

In the following analysis, we conclude that the trial court did not err by excluding the doctrines of strict liability and negligence per se and expert testimony concerning the number of times a mortar launching tube had been used. However, we conclude the trial court erred in refusing to permit the introduction of the National Fire Protection Association pamphlet No. 1123, *Code for Fireworks Display* (2000 ed.) (NFPA 1123), through Pullen's expert and by way of jury instructions, which contained rules and regulations regarding the handling of class B fireworks displays.

*APPLICATION OF THE DOCTRINE OF STRICT LIABILITY*

Before the trial, Pullen filed a motion for partial summary judgment, asking the court to rule as a matter of law that the use of commercial-quality, class B explosive fireworks during an illegal fireworks display constitutes an "abnormally dangerous activity" requiring the application of the strict liability doctrine.

In denying Pullen summary judgment on the issue of strict liability, the trial court avoided a decision on the issue of whether the use of class B explosive fireworks constituted an "abnormally dangerous activity," which is a necessary finding before the doctrine of strict liability may be applied. The trial court noted this was an issue of first impression in Kansas and that a split of authority existed on this issue among jurisdictions throughout the country. Our research confirms the above findings. See *Litzmann v. Humboldt County*, 273 P.2d 82, 88 (Cal. App. 1954) (doctrine of absolute liability not applicable to public fireworks display); *Cadena v. Chicago Fireworks Mfg. Co.*, 297 Ill. App. 3d 945, 962, 697 N.E.2d 802 (1998) (public fireworks display not ultrahazardous activity); *Haddon v. Lotito*, 399 Pa. 521, 523-24, 161 A.2d 160 (1960) (a public fireworks display handled by competent operator in reasonably safe area and properly supervised is not ultrahazardous). But see *Miller v. Westcor Ltd. Partnership*, 171 Ariz. 387, 391-94, 831 P.2d 386 (1991), *rev. denied* (1992) (operating public fireworks display inherently dangerous activity); *Lipka v. DiLungo*, 2000 WL 295355 (Conn. Super.) (unpublished opinion filed March 8, 2000)

(abnormally dangerous activity); *Klein v. Pyrodyne Corporation,* 117 Wash. 2d 1, 5-11, 810 P.2d 917, *amended* 117 Wash. 2d 1, 817 P.2d 1359 (1991) (strict liability applies).

The doctrine of strict liability for abnormally dangerous activities is derived from the English case of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868). There, water from the defendants' reservoir broke through the disused and filled-up shaft of an abandoned coal mine and flooded the connecting mine belonging to the plaintiff. The defendants were held liable upon the theory the defendants had made a "non-natural use" of their land, which brought with it increased danger to others. See *Williams v. Amoco Production Co.,* 241 Kan. 102, 113-15, 734 P.2d 1113 (1987). The *Williams* court adopted § 519 and § 520 of the Restatement (Second) of Torts (1976):

"The general rule imposing strict liability in tort for abnormally dangerous activities as set forth in the Restatement (Second) of Torts § 519 (1976) is stated and adopted: (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm; and (2) this strict liability is limited to the kind of harm the possibility of which makes the activity abnormally dangerous."

"In determining whether an activity is abnormally dangerous, the following factors are to be considered: (a) Existence of a high degree of risk of some harm to the person, land, or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes. Restatement (Second) of Torts § 520 (1976)." 241 Kan. 102, Syl. ¶¶ 8, 9.

The Commentary to the Restatement (Second) of Torts § 520 states that whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed in the section defining an abnormally dangerous activity. *Falls v. Scott,* 249 Kan. 54, 60-61, 815 P.2d 1104 (1991). When ruling on a motion for summary judgment involving this issue, *Falls* is instructive:

"When the facts are undisputed, whether an activity is inherently or intrinsically dangerous is a question of law to be decided by the court. When ruling on a

motion for summary judgment involving this question, the trial court as a matter of law must determine from the undisputed facts contained in the record whether the activity under review is inherently dangerous. When the facts are disputed, the question is to be determined by the jury." 249 Kan. 54, Syl. ¶ 3.

On appeal, Pullen argues that the trial court erred in finding that the fireworks display was not an abnormally dangerous activity and that the doctrine of strict liability was inapplicable to this case. We note that while the trial court discussed some of the factors to be considered in determining whether an activity is abnormally dangerous, its focus was upon the question concerning the plaintiff's participation in the very activity he asked the court to declare abnormally dangerous: "[T]he Court has a question regarding whether strict liability in this case would also apply to the plaintiff's actions."

Upon finding that the facts necessary to a proper disposition of this issue were not entirely undisputed, the trial court ultimately concluded "that the appellate courts of Kansas would not apply the strict liability doctrine under the facts of this case." Thus, without deciding the issue of whether the activity was abnormally dangerous, the trial court resolved the applicability of strict liability upon the fact that Pullen participated in the very activity he claimed was abnormally dangerous. The defendants based much of their arguments that the doctrine did not apply upon this crucial fact. In this determination, we conclude that the trial court's decision was correct and thus we need not reach a conclusion as to whether the class B fireworks display was an abnormally dangerous activity.

The defendants argue on appeal that Pullen's participation in the activity barred his recovery under § 523 and § 520 of the Restatement (Second) of Torts (1976).

"The plaintiff's assumption of the risk of harm from an abnormally dangerous activity bars his recovery for the harm." Restatement (Second) of Torts § 523 (1976). Comment d to § 523 provides:

"The risk is commonly assumed by one who takes part in the activity himself, as a servant, an independent contractor, *a member of a group carrying on a joint enterprise* or as the employer of an independent contractor hired to carry on the activity or to do work that must necessarily involve it. Thus a plaintiff who accepts

employment driving a tank truck full of nitroglycerin, with knowledge of the danger must be taken to assume the risk when he is injured by an explosion." (Emphasis added.)

However, in this argument, the defendants failed to note that the common-law doctrine of assumption of the risk in Kansas cases is restricted to cases involving employer-employee relationships. *Tuley v. Kansas City Power & Light Co.*, 252 Kan. 205, 210, 843 P.2d 248 (1992). As this case does not present such a situation, § 523 does not operate as a complete bar to the Pullen's recovery.

Nevertheless, "[t]he benefit of strict liability does not run to a person participating in the activity deemed ultrahazardous." 57 Am. Jur. 2d, Negligence § 390, p. 429. One of the factors under Restatement (Second) of Torts § 520 is that the activity carries "(a) the existence of a high degree of risk of some harm to the person, land or chattels *of others.*" (Emphasis added.) Defendants contend on appeal that by directing the assessment of the risk to "others," the drafters of the first Restatement (using the term ultrahazardous rather than abnormally dangerous) intended to prevent persons participating in ultrahazardous activities from utilizing the benefit of the strict liability doctrine. Restatement of Torts § 520 (1938).

In the case of *Whitlock v. Duke University*, 637 F. Supp. 1463, 1475 (M.D.N.C. 1986), *aff'd* 829 F.2d 1340 (4th Cir. 1987), relied upon by the defendants, the court noted:

"North Carolina recognizes ultrahazardous activities as a basis for applying strict liability. [Citations omitted.] However, in none of the cases cited by the plaintiffs does the benefit of strict liability run to a person participating in the activity deemed to be ultrahazardous. Indeed, plaintiffs cite Restatement of Torts § 520 (1938) as reflecting North Carolina's law of ultrahazardous activity; § 520 states an ultrahazardous activity is one which: 'a) Necessarily involves the risk of serious harm to the person, land, or chattels of *others* . . .' (emphasis added). Again, the benefit of strict liability under § 520 runs to 'others'; not to those engaged in the activity. *See also Gaston v. Hunter,* 121 Ariz. 33, 48, 588 P.2d 326, 341 (1978). In *Trull,* 264 N.C. 687, 142 S.E.2d 622 (1965), the plaintiffs sought to impose liability upon the defendant for vibration injury associated with well drilling. Plaintiffs had contracted with the defendant and brought defendant on their land to drill the well. The *Trull* court held plaintiffs could not recover because they were not innocent parties within the rule of strict liability. *Id.* at 693. The court stated, '[h]ere the activity was not upon adjoining or neighboring property . . . nor were the plaintiffs unconcerned with the activity itself.' In the instant case Mr. Whitlock

was a participant in the very activity alleged to be ultrahazardous. Therefore, the Court is persuaded that North Carolina's law of ultrahazardous activity is inapplicable to the case at bar."

The defendants' argument is persuasive. As implicitly noted by the trial court, strict liability in the context of this case does not apply to the plaintiff who participated in the activity. Rather, it applies to others harmed by the abnormally dangerous activity. While Pullen is not completely barred from recovery based on his participation in an abnormally dangerous activity, he is unable to obtain the benefit of the doctrine of strict liability because he participated in the abnormally dangerous activity. As such, the trial court properly concluded that the doctrine of strict liability was not available to Pullen under the facts of this case.

The defendants also argue that if the trial court should have applied the doctrine of strict liability to this case, any error would be harmless. They reasoned that because the Kansas comparative negligence statute, K.S.A. 2003 Supp. 60-258a, applies to cases decided under the doctrine of strict liability, the jury would have reached the same conclusion that Pullen was 92% at fault, barring his recovery. See *M. Bruenger & Co., v. Dodge City Truck Stop, Inc.*, 234 Kan. 682, 687, 675 P.2d 864 (1984).

While the evidence presented at trial would likely have been the same if the doctrine of strict liability had been applied, the possibility exists that the jury would have assessed more fault to all of the defendants if it were instructed as a matter of law that they were strictly liable for Pullen's injuries, even if comparative fault was applied. As such, this argument alone is not grounds for affirming the trial court.

## APPLICATION OF THE DOCTRINE OF NEGLIGENCE PER SE

Pullen argues as he did before the trial court that the doctrine of negligence per se applies and he was entitled to a jury instruction on this theory. He contends that the Kansas Fire Safety and Prevention Act, K.S.A. 31-132 *et seq.*, creates a cause of action based upon a violation of statutes governing the handling of fireworks.

"The elements of negligence per se are (1) a violation of a statute, ordinance, or regulation, and (2) the violation must be the cause of the damages resulting therefrom. In addition, the plaintiff must also establish that an individual right of action for injury arising out of the violation was intended by the legislature." *Cullip v. Domann*, 266 Kan. 550, Syl. ¶ 3, 972 P.2d 776 (1999).

"Generally, the test of whether one injured by the violation of a statute may recover damages from the wrongdoer is whether the legislature intended to give such a right. While, in some cases, statutes expressly impose personal liability on persons or entities for violation of the provisions thereof, or for failure to perform specified duties, the absence of such express provisions does not necessarily negate a legislative intent that the statute shall affect private rights. The legislative intent to grant or withhold a private cause of action for a violation of a statute, or the failure to perform a statutory duty, is determined primarily from the form or language of the statute. The nature of the evil sought to be remedied and the purpose the statute was intended to accomplish may also be taken into consideration. The generally recognized rule is that a statute which does not purport to establish a civil liability but merely makes provision to secure the safety or welfare of the public as an entity is not subject to construction establishing a civil liability.
 "The question whether a liability arising from the breach of a duty prescribed by statute accrues for the benefit of an individual specially injured thereby, or whether such liability is exclusively of a public character, depends upon the nature of the duty imposed and the benefits to be derived from its performance, and the relevancy of the rule laid down by the statute to private rights. 73 Am. Jur. 2d, Statutes §§ 431 and 432, pp. 529-30." *Greenlee v. Board of Clay County Comm'rs*, 241 Kan. 802, 804, 740 P.2d 606 (1987).

The determination of whether a private right of action exists under a statute is a question of law. Kansas courts generally use a two-part test in determining whether a private right of action is created. First, the party must show that the statute was designed to protect a specific group of people rather than to protect the general public. Second, the court must review legislative history in order to determine whether a private right of action was intended. See *Nichols v. Kansas Political Action Committee*, 270 Kan. 37, 11 P.3d 1134 (2000) (quoting *Nora H. Ringler Revocable Family Trust v. Meyer Land and Cattle Co.*, 25 Kan. App. 2d 122, 126, 958 P.2d 1162, *rev. denied* 265 Kan. 886 [1998]) (the *Ringler* test).

K.S.A. 31-133(a)(1) instructs the state fire marshal to adopt reasonable rules and regulations for the keeping, storage, use, sale, handling, transportation or other disposition of fireworks and firecrackers. K.S.A. 31-133(b) provides that any rules and regulations

adopted pursuant to this statute may incorporate by reference specific editions or portions of nationally recognized fire prevention codes. The state fire marshal has adopted by reference the National Fire Protection Association's pamphlet, NFPA 1123 (Approved as an American National Standard on August 18, 2000; 2000 edition supercedes all previous editions.). See K.A.R. 22-1-3(x) (2003 Supp.). The state fire marshal prevention division has also issued pamphlets entitled Fire Fact FO-1, Licensing of Fireworks Operators, and Fire Fact FO-2, Guidelines for Fireworks Displays (which quote their references as NFPA 1123).

The trial court found, and we agree, that Fire Facts FO-1 and FO-2 are synopses of regulations as opposed to regulations themselves, and the primary focus of the analysis must be on the enabling legislation rather than upon the regulations promulgated pursuant thereto. The court found that it must look to what the particular legislative body intended as opposed to how the administrative agency interpreted their enabling legislation, and that the state fire marshal's office could not create a private cause of action not intended by the legislature.

Looking at the Fire Safety and Prevention Act, the trial court concluded that negligence per se was not applicable to this case, reasoning:

"Number one, this statute contains specific criminal penalties, as well as injunctive relief by the attorney general, the district attorney, or the county attorney at K.S.A. 31-150a and specific administrative sanctions at K.S.A. 31-159. K.S.A. 31-137 confers the right of entering and inspection as to public buildings, businesses and residences. At K.S.A. 31-142, the statute confers the right of judicial review of fire marshal's actions.

"Point number two: This statutory scheme contains no express provision allowing for a private cause of action to enforce the same. Number three: Reading the statue as a whole, it is more than, it is broader than, just the regulation of fireworks; it also address fire safety in business and residences and public facilities. Number four: By its very provisions it is clear that this statue is drawn so as to provide protection to the public at large. Although it is clear and true that portions of this statute enable the enactment of regulations which by their nature target smaller groups or classes of people, it is also clear that the statute as a whole, when read in its entirety, is designed and written to protect the public at large. And so as to part one of the *Ringler* test concerning private causes of action, the Court finds in favor of the defendants.

"As to the second part of the *Ringler* test, the Court cannot find that the Kansas legislature intended for this statute to create a private cause of action. As already pointed out, the legislature included within the statute a panoply of enforcement mechanisms, both criminal and administrative. The legislature could have just as easily, but did not, expressly grant a private cause of action, nor can this Court infer a private cause of action from this statute."

Pullen argues the defendants violated Kansas statutes, rules, and regulations governing class B firework displays by: (1) failing to obtain the proper permit to conduct the class B display; (2) failing to have a licensed operator in charge and supervise the discharge of the class B display; and (3) failing to follow the rules and regulations of NFPA 1123 governing the display site set-up, proper training of assistants, provision of safety equipment, and procedures for discharging a class B fireworks display as adopted by the state fire marshal. He contends these violations were not in dispute and were the proximate cause of his injuries, leaving as the sole issue to be decided whether he had a private cause of action.

Under the first part of the *Ringler* test (25 Kan. App. 2d at 126), Pullen cites *Schlobohm v. United Parcel Service, Inc.*, 248 Kan. 122, 804 P.2d 978 (1991), in arguing that the statutes and regulations in this case were designed to protect not only the general public but specific individuals, such as Pullen, who are assistants in the discharge of fireworks.

In *Schlobohm*, the plaintiff was injured when walking into a UPS entranceway that had an elevation differential that violated the Uniform Building Code (Code) adopted by city ordinance, and she sought to admit the Code as evidence of negligence per se. On appeal, this court found that the stated purpose of the Code, to provide "minimum standards to safeguard life or limb, health, property, and public welfare," indicates a legislative intent to provide for the safety of the public in general and not for a particular class of persons. 248 Kan. at 127.

However, the ordinance specifically stated that civil liability was not relieved by the enactment even though criminal liability could attach for violation of any of the provisions. The court noted the similarity of the ordinance with that discussed in *Noland v. Sears, Roebuck & Co.*, 207 Kan. 72, 483 P.2d 1029 (1971) (private right

of action under city code requiring handrails in stairways), and concluded that the particular section of the Code dealing with the change in floor level at doors protects persons who enter and exit doorways from injury caused by tripping and, thus, was enacted to protect a specific class of individuals. *Schlobohm*, 248 Kan. at 127.

In this case, the express legislative purpose in directing the state fire marshal to adopt reasonable fireworks rules and regulations is "for the safeguarding of life and property from fire, explosion and hazardous materials." K.S.A. 31-133(a). The scope of this enabling legislation is thus very broad and is not limited to enacting rules and regulations specifically for those involved in fireworks displays. Moreover, under K.S.A. 31-134 all rules and regulations adopted by the state fire marshal must comply with K.S.A. 77-415. K.S.A. 77-415(4) provides that a "rule" or "regulation" or words of like effect "mean a standard, statement of policy or general order . . . *of general application* and having the effect of law." (Emphasis added.)

The scope of NFPA 1123 is defined to apply to the construction, handling, and use of fireworks and equipment used for outdoor fireworks display and applies "to the general conduct and operation of the display." NFPA 1123 § 1.1. The stated purposes of NFPA 1123 are "to provide requirements for the reasonably safe conduct of outdoor fireworks displays," "to provide recommended local permit regulations," and "to provide recommended regulations for state certification of display operators." See NFPA 1123 §§ 1.2.1, 1.2.2, 1.2.3.

NFPA 1123 is likewise composed of broad industry standards covering all aspects of fireworks regulation, including construction, storage, and transportation of fireworks; display safety distances; display installations and operations; and operator qualifications. While portions of NFPA 1123 certainly apply to certain groups of individuals, the overall purpose of NFPA 1123 is not just to protect those individuals watching or putting on the display because the danger certainly exists that others (the general public) might be harmed by the storage, use, or transportation of fireworks. These standards, thus, stand in contrast to the specific building code at issue in *Schlobohm*, which was only designed to protect those peo-

ple entering and exiting a certain building. The trial court correctly concluded that K.S.A. 31-133 and the adopted regulations were designed to protect the public in general rather than a specific group of individuals.

Under the second part of the *Ringer* test, Pullen argues that NFPA 1123 does not preclude a private right of action for several reasons. First, he argues it is clear that NFPA 1123 was intended not only for fire protection but to reduce the risk of death or serious injuries to participants in a class B fireworks display. As discussed above, it is clear that the provisions of NFPA 1123 were designed to protect both participants in the display as well as the general public.

Second, Pullen contends the language and form of the authorizing statutes and regulations do not preclude civil liability, as NFPA 1123 does not address criminal or administrative sanctions for violations and expressly contemplates a private cause of action by requiring the display operator, sponsor, or both to present verifiable proof of liability insurance. See NFPA 1123, Appendix F §§ F.4 and F.4.1 ("Separate insurance coverage might be required for personal injuries or accidents arising from other aspects of the event. Insurance is intended to indemnify the operator in the event of an accident arising from the outdoor display.").

While it is true that NFPA 1123 addresses the consequences of violations, the Fire Safety and Prevention Act, which under K.S.A. 31-134 allowed the adoption of NFPA 1123 as a regulation, provides that a violation of its provisions is a criminal offense and subject to monetary penalties. Moreover, the insurance requirement under NFPA 1123 does not establish that a private cause of action was intended. Fireworks displays by their very nature are dangerous, and this insurance requirement recognizes that a tort claim could be brought against the operator of the display in the event of injury. NFPA 1123 does not expressly provide for a private right of action.

Third, Pullen argues that no language in the Fire Safety and Prevention Act indicates that the legislature intended to prohibit a private right of action based upon a breach of NFPA 1123. Pullen points out that K.S.A. 31-163 provides criminal penalties for failure

to comply with K.S.A. 31-162, which deals with the installation of smoke detectors in dwelling units, but K.S.A. 31-162(g) also provides that evidence of the failure of a property owner to provide or maintain a smoke detector "shall not be admissible in any action for the purpose of determining any aspect of civil liability." Pullen contends that by negative implication it is apparent that the legislature did not intend such a result for the preceding statutory provisions, including K.S.A. 31-134, which permitted the state fire marshal to adopt NFPA 1123.

This argument is without merit for two reasons. First, while found in Chapter 31, Fire Protection, the smoke detector provisions are part of the Smoke Detector Act, K.S.A. 31-160 *et seq.*, enacted in 1998, and are subject to different criminal penalties (nonclass nonperson misdemeanor) and fines ($25) than the statutory provisions relevant to this case. Moreover, the fact that the smoke detector provisions cannot be used to establish civil liability does not mean that a private cause of action was intended under these statutory provisions.

Second, the Fire Safety and Prevention Act provides that any person who violates any rules or regulations adopted under the fire prevention code is guilty of a class B misdemeanor. K.S.A. 31-150a(a). Violations can also result in administrative penalties up to $1,000, "which shall constitute an actual and substantial economic deterrent to the violation for which the penalty is assessed." K.S.A. 2003 Supp. 31-159(a). The aggrieved person may appeal the penalty to the state fire marshal, and then further appeal any order issued in accordance with the provisions of the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* K.S.A. 2003 Supp. 31-159(b) and (c).

Kansas appellate courts generally will not infer a private cause of action where a statute provides criminal penalties but does not mention civil liability. See *Kansas State Bank and Tr. Co. v. Specialized Transportation Services Inc.*, 249 Kan. 348, 373, 819 P.2d 587 (1991) ("If the legislature had intended to grant a private right of action in K.S.A. 38-1522 [child abuse reporting statute which provided for criminal penalties] it would have specifically done so."); *Greenlee*, 241 Kan. at 808 ("It would appear that the legis-

lature has thoroughly addressed the legislative remedies for violation of the cash-basis law and the budget law, and that failure to provide a private cause of action for an individual citizen was intentional."); *Loar v. Roletto*, 26 Kan. App. 2d 246, 248, 982 P.2d 993 *rev. denied* 268 Kan. 887 (1999) (Where legislature provides criminal and administrative remedies for violation of Kansas Automobile Injury Reparations Act, "[t]he absence of a provision securing a private cause of action appears to be intentional."); *Gietzen v. Feleciano*, 25 Kan. App. 2d 487, 490, 964 P.2d 699 (1998) ("The legislature saw fit to limit the relief from a violation of the [Campaign Finance Act] to a complaint before the Commission [on Governmental Standards and Conduct]. It did not provide a cause of action for damages in favor of a party aggrieved about a violation, and we will not read one into the statute.").

This court expanded on this point in discussing violations of the Campaign Finance Act in *Nichols v. Kansas Political Action Committee*, 270 Kan. at 52. In finding no private cause of action existed, the court noted that the wrong perpetrated by the defendants "became a wrong only [because] the legislature made it so" and the "statutorily created wrong is to be remedied in the manner prescribed by the legislature." 270 Kan. at 52.

Pullen points to *Schlobohm* and the Uniform Act Regulating Traffic (UART), K.S.A. 8-1401 *et seq.*, as situations where criminal penalties are imposed but private cause of actions still exist. However, *Schlobohm* is distinguishable in that the ordinance specifically stated that civil liability was not relieved by its enactment, although its violation may induce a fine or imprisonment. 248 Kan. at 126-27.

The provisions of the Kansas Fire Prevention Act and NFPA 1123 do not expressly create a private cause of action. Disobeying the requirements for permits, licenses, and safety procedures is only wrong because the state fire marshal adopted NFPA 1123 as a regulation through the authority granted by the legislature. The provisions of the Kansas Fire Prevention Act create criminal and administrative penalties for violations of NFPA 1123. Pullen fails to demonstrate that the legislature intended to create a private cause of action. The authority cited above establishes that the leg-

islature did not intend to establish a private cause of action for violations of NFPA 1123. We conclude that the trial court properly ruled that the doctrine of negligence per se was inapplicable to this case.

## INTRODUCTION OF NFPA 1123 TO THE JURY

After ruling that the doctrine of negligence per se was inapplicable to this case, the trial court refused to allow Pullen to introduce any evidence of NFPA 1123 to the jury. Specifically, the trial court refused to instruct the jury regarding relevant portions of NFPA 1123 regarding class B fireworks displays and refused to permit Pullen's expert, Chuck Thacker, to testify about the application of NFPA 1123 to the incident in this case.

Prior to instructing the jury, the trial judge expressed concern about making any references to NFPA 1123 based on its prior negligence per se ruling:

"Well, what I think would be inconsistent for me to do would be to have made the ruling that I've made up to this point [negligence per se] and then to instruct the jury . . . that there are certain duties imposed upon a landowner, to wit to limit the number of launchings from a tube and to require head, eye and ear protection. That would be basically to create a private cause of action when I have said that there is no such private cause of action."

The question we must resolve is whether trial court's exclusion of the pertinent provisions of NFPA 1123 prejudiced the plaintiff and denied him a fair trial. We conclude that the exclusion of such evidence prejudicially affected the jury's determination of fault and had the pertinent provisions of NFPA 1123 been admitted the verdict might very well have been different.

Pullen's proposed jury instructions regarding the duty of care included requests consistent with pertinent provisions of NFPA 1123 that the jury consider the cost and inconvenience of requiring proof that the operator was properly licensed and insured and that permits and site inspections were completed as required by state statutes, rules or regulations or local ordinances.

Pullen's proposed instructions also provided that he sustained injuries due to the fault of the various defendants in several ways

which were specific violations of the Kansas statutes and rules and regulations. For example, relevant to Krehbiel:

"(1) In failing to obtain the proper fireworks display operator license required by the state of Kansas;

"(2) In failing to provide proper training in the discharge of the Class B fireworks;

"(3) In failing to provide proper safety equipment required to discharge the Class B fireworks;

"(4) In allowing plaintiff to participate in the discharge of the Class B fireworks;

"(5) In failing to properly supervise the discharge of the Class B fireworks;

"(6) In failing to warn plaintiff of the degree of danger involved in the discharge of the Class B fireworks;

"(7) In failing to obtain the proper permit issued by the local authorities as required by the statutes, rules and regulations adopted by the state of Kansas;

"(8) In failing to have the fireworks display site inspected by the proper local authorities prior to the fireworks display as required by statues, rules and regulations adopted by the state of Kansas;

"(9) In failing to replace mortars after every 7 launchings; and

"(10) In failing to abide by all regulations applicable to the discharge of Class B fireworks."

Instead, the trial court instructed the jury that the duty owed by an occupier of land was one of reasonable care under the circumstances, which could be determined by considering the foreseeability of harm to the plaintiff, the magnitude of the risks of injury to others, the individual and social benefits of maintaining the land in such a condition, and the cost and inconvenience of providing adequate protection whether incurred by the owner or occupier of the land and/or community. See PIK Civ. 3d 126.02.

The jury was also instructed that Pullen claimed that his injuries were sustained due to the fault of the various defendants, as follows:

"1. As owner [occupier] of the land and co-sponsor of the Class B fireworks display, failing to exercise reasonable care under all the circumstances surrounding the Class B fireworks display.

"2. As owner [occupier] of the land and co-sponsor of the Class B fireworks display, failing to take exceptional precautions to prevent injuries from the Class B fireworks.

"3. As owner [occupier] of the land and co-sponsor of the Class B fireworks display, failing to make certain that the launching tubes were changed during the fireworks display.

"4. As owner [occupier] of the land and co-sponsor of the Class B fireworks display, failing to provide head protection and eye protection to the shooters."

If the jury instructions, read as a whole, fairly instruct the jury on the law governing the case and are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal. Refusing to give an instruction is not error when its substance is adequately covered in other instructions. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. *Koser v. Atchison, Topeka & Santa Fe Ry. Co.*, 261 Kan. 46, 51, 928 P.2d 85 (1996).

Pullen argues the trial court misunderstood the application of NFPA 1123 as it related to proof of the standard of care and his proffered evidence in this case. Pullen contends that NFPA 1123 was admissible as an industry standard and he should have been permitted to present those standards to the jury. Pullen contends that the trial court essentially gutted his case, leaving him to argue without any substantiation or legal support that the defendants had breached a duty of care to him. We agree.

In *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 837 P.2d 330 (1992), a sailboat owner brought personal injury and wrongful death actions against the electric company after his wife was electrocuted and he was injured when the mast of his sailboat contacted a power line strung over a lake. At trial, a copy of the pertinent provisions of the National Electrical Safety Code (NESC) was received into evidence, and the jury was instructed that it was to decide whether the NESC was applicable and if any provisions had been violated. The jury was instructed that evidence of compliance or lack of compliance with applicable safety codes was not conclusive on the question of presence or lack of ordinary care and that proof of compliance was not a defense to a charge of negligence unless such practice is consistent with standards of ordinary care.

On appeal, Flint Hills argued that the trial court erroneously imposed negligence per se for an alleged violation of the NESC, because Flint Hills equated the NESC with an ordinance. This court declined to construe the NESC as an ordinance but rather construed it as an industry standard approved by the American National Standards Institute. 251 Kan. at 356. In concluding that the jury instructions conformed with Kansas negligence law, the *Cerretti* court reasoned:

"Conformity with the NESC or an industry-wide standard is not an absolute defense to negligence. While it may be evidence of due care, compliance with industry standards, or standards legislatively or administratively imposed, does not preclude a finding of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances. Whether the company is negligent, even though it complied with the code, is usually a question to be determined by the jury under proper instructions by the court.

"The degree of care required for Flint Hills is that which would be used by a prudent person engaged in the industry, under like conditions and commensurate with the dangers involved and the practical operation of the system, to guard against contingencies which can reasonably be foreseen and anticipated. Flint Hills was aware that persons sailing upon the lake could be seriously injured or killed if a boat's aluminum mast contacted its high voltage power line strung over the lake. The law imposes upon Flint Hills the duty of exercising the utmost or highest degree of care to prevent such injury where people have the right to be upon the property for work, pleasure, or business. Conformity with an industry-wide standard when a high voltage line was originally installed does not preclude a finding of negligence where a prudent person engaged in the industry would have taken additional precautions under the circumstances." 251 Kan. at 356-57.

In this case, the 2000 edition of NFPA 1123 was approved as an American National Standard on August 18, 2000, and it superceded all previous editions of NFPA 1123 as the applicable industry standard. (NFPA 1123, p. 1123-1.) Pullen argues that the applicable provisions of NFPA 1123 are admissible to prove the minimum standards of care necessary for the safety of the public and anyone assisting in a class B fireworks display. We agree.

Expert testimony concerning customs or industry standards is not relevant, or at least unnecessary, where the jury is competent from its own experience to determine and apply the reasonable care standard. *Simon v. Simon*, 260 Kan. 731, Syl. ¶ 4, 924 P.2d 1255 (1996). However, without utilizing these standards in this

case, the jury was left to determine what "reasonable care" and extraordinary precautions" must be exercised by persons sponsoring and participating in a class B fireworks display. The jury likely had little experience or knowledge regarding commercial fireworks, what types of safety precautions must be taken, and the requirements for operation of displays, operator qualifications, and licenses or permits. See *Simon*, 260 Kan. 731, Syl. ¶ 3.

An example of how difficult this determination would be for the jury is as follows: NFPA 1123 § 2.3.4 requires that the type of mortar tubes used in this case should only be fired up to 7 times during a performance. Evidence was presented at trial that the mortar tubes were used 75 times or more and that one of the mortar tubes used by Pullen was melted or deformed. The jury was simply instructed that Pullen claimed the defendants were negligent by "failing to make certain that the launching tubes were changed during the fireworks display." Without any guidance regarding the NFPA requirement, the jury had no way of knowing that the mortar tubes were used 10 times more than the industry standard—which might have resulted in the deformity to the tube. With this information, a possibility certainly exists that the jury might have assigned more fault to the defendants.

Additionally, NFPA 1123 places several requirements upon the operator and sponsors of a fireworks display to ensure safety. NFPA 1123 §§ 7.1 and 7.3 provide that the operator (Krehbiel) was required to be licensed and that the operators, suppliers, or the sponsors (Milo, Laura, & Brian West) were required to obtain a permit. This would have insured operator competency, requiring experience and knowledge of the laws, regulations, and safety practices of the operator, and demonstrated the financial responsibility of the operators, suppliers, or sponsors, requiring proof of liability insurance. NFPA 1123 §§ 5.1.3 and 5.1.3.2 also provide that Krehbiel was primarily responsible for safety and for ensuring that all assistants were fully trained. However, many safety provisions were violated during the display because the shooters did not wear head and eye protection, used cigars although smoking materials are not allowed near the fireworks, or were under the influence of alcohol. See NFPA 1123 §§ 5.1.3.3, 5.1.6, and 5.1.8. Once again, had the

jury been instructed regarding these standards, a real possibility exists that the jury would have assigned more fault to the defendants.

After ruling that the doctrine of negligence per se was inapplicable to this case, the trial court mistakenly excluded any mention of the requirements of NFPA 1123 to the jury. As noted in *Cerretti*, " 'mere proof of failure to comply with a given safety standard does not automatically demonstrate the lack of ordinary care and negligence.' " 251 Kan. at 354. Thus, the NFPA 1123 standards were important to Pullen's case so that the jury could evaluate the degree of care owed when sponsoring or participating in a class B fireworks display, and the district court should have so instructed. We have no doubt that the exclusion of the pertinent provisions of the industry standards contained in NFPA 1123 prejudiced Pullen, requiring this court to reverse and remand for a new trial consistent with this opinion.

### EXPERT TESTIMONY REGARDING THE RULES AND REGULATIONS GOVERNING CLASS B FIREWORKS AND THE CAUSATION OF PULLEN'S INJURIES

Pullen argues the trial court abused its discretion by not permitting expert witness Chuck Thacker to testify about the rules and regulations governing class B fireworks and the causation of his injuries.

"The qualification of an expert witness as well as the admissibility of expert testimony are matters within the broad discretion of the trial court. The admissibility of expert testimony is a matter to be determined by the trial court in the exercise of its discretion. The trial court's determination will not be overturned absent an abuse of such discretion."

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness. K.S.A. 60-456(b)." *Dieker v. Case Corp.*, 276 Kan. 141, Syl. ¶¶ 1, 2, 73 P.3d 133 (2003).

In order for expert testimony to be admissible, the testimony must be helpful to the jury and the basis of the expert's opinion must be shown to be generally acceptable within the expert's par-

ticular scientific field. Expert conclusions or opinions are inadmissible where the normal experiences and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances. *State v. McIntosh*, 274 Kan. 939, 956, 58 P.3d 716 (2002).

Chuck Thacker has a Master's Degree in Public Administration and a Bachelor of Science degree in Fire Science. He currently is Deputy Chief of the Grandview, Missouri, Fire Department, and president of Thacker & Associates, L.L.C., an organization devoted to fire protection consulting. He previously worked for the Excelsior Springs, Missouri, Fire Department for 10 years where he dealt with fires and injuries related to fireworks. He also was Deputy Chief of the Overland Park, Kansas, Fire Department for 12 years, where for 10 years, part of his responsibilities were ensuring that mortar tubes in an annual fireworks display were not overused, that the shooters were properly licensed, and that the display area was properly set up.

Thacker was initially contacted by Pullen to conduct a code analysis of the fireworks display incident in this case, which included examining the code requirements that apply to the launching of class B fireworks, determining what violations occurred, and checking for the issuance of proper permits and licenses. In a report dated July 24, 2002, Thacker reviewed NFPA 1123, the Kansas State Fire Marshal Prevention Division Fire Facts FO-1, Licensing of Fireworks Operators, and FO-2, Guidelines for Fireworks Displays, and the Kansas State Fire Marshal regulations, K.A.R. 22-1-1 *et seq*. He opined as to which NFPA 1123 requirements and regulations applied to this case and what violations occurred during the fireworks display.

Thacker's second report dated September 30, 2002, set forth four possible theories of what may have caused the accident, including improper use of mortars, improper fuse lighting equipment, physical (alcohol) impairment, and shell misfire, reasoning in relevant part:

"NFPA 1123, Section 2.3.4. states that mortars of any type 6 inches in diameter or less shall be permitted to be reloaded and fired up to 7 times during a performance. The exception to this requirement is there is no limit to the number

of times a steel mortar 6 inches or less can be reloaded. The mortars used in this display were plastic. According to Shane Krehbiel, there were 75 launchings from each tube.

"This overuse of the mortars *may have* created enough heat to cause the mortar to deform thereby causing the shell to leave the mortar at an angle different then intended.

"The overuse of the mortars *may have* created enough heat to cause the fuse for the shell or the shell itself to reach its ignition temperature and misfire.

"Cigars were used to light the fuses for this display. An ash *may have* fallen from a cigar into a mortar and caused the shell to fire. NFPA 1123, Section 5.1.6 states that smoking materials, matches or open flame devices shall not be allowed within 50 feet of any area where fireworks or other pyrotechnic materials are present. The exception is that fuses, portfires, and torches shall be permitted to ignite fireworks.

"Alcoholic beverages were being consumed during the display. NFPA 1123, Section 5.1.8 states that no person shall be allowed in the discharge area while under the influence of alcohol, narcotics or medications that could adversely affect judgment, mobility or stability.

"The shell *may have* misfired. There are times when shells have misfired. If a shell misfired, this misfire *could have* caused other shells in the vicinity to also fire. The concussion from a misfire *may have* been enough to alter the trajectory of other shells in the vicinity." (Emphasis added.)

The report also considered the reasons for NFPA 1123 § 2.3.4:

"Upon reviewing Section 2.3.4 of NFPA 1123, I spoke with the staff liaison for this document. Section 2.3.4 was added to the document to establish a standard for not steel mortars. The committee determined that seven firings were not enough before non-steel mortars began to deform. The committee based their decision on pyrotechnic industry experience."

Prior to trial, Krehbiel filed a motion in limine seeking to prohibit Pullen and any witnesses from stating, mentioning, or referring to the contents of those expert reports and the opinions stated therein, NFPA 1123, and Kansas State Fire Marshal Fire Facts FO-1 & FO-2.

The trial court excluded the July 24, 2002, report because it simply contained Thacker's opinions about what law applied in this case, which was a question for the court. The trial court later excluded the opinions contained in Thacker's September 30, 2002, report because:

"1. There is no factual foundation for Mr. Thacker's opinions.

"2. Mr. Thacker's opinions are speculation and conjecture.

"3. Mr. Thacker lacks the qualifications necessary to render such opinions.

"4. The information received regarding NFPA is hearsay."

The trial court's exclusion of the September 30, 2002, report is supported by Thacker's own deposition testimony on December 6, 2002. Thacker admitted that he had never performed an analysis of the code requirements and regulations that apply to the launching of class B fireworks, that he had never personally shot off class B fireworks, that he did not do any testing of fireworks in this case, and that he did not consider himself to be a fireworks expert. It is, thus, difficult to conclude that no reasonable person would have found him unqualified to give an expert opinion regarding causation in this case.

Likewise, Thacker also admitted that he did not have evidence to support most of his theories of causation, such as evidence that the mortar tubes were deformed, that they had been overused to the point that the heat would cause the shell to misfire, or that any of the launchers were physically impaired by alcohol when shooting off the fireworks. The only evidence of a misfire was that two shells exploded between the top of the barrels at the roof line and Pullen's head injuries might indicate that one of the shells misfired. However, Thacker did not examine any of the shells to help definitively make this determination. As such, no factual foundation existed for these opinions and they were simply based on conjecture and speculation. The trial court did not abuse its discretion by excluding the September 30, 2002, report.

The trial court excluded the July 24, 2002, report, reasoning that it would decide what law was applicable to this case, and the court later mistakenly determined that the jury should not be exposed to any evidence of the NFPA 1123 requirements adopted by the Kansas State Fire Marshal. Although the court clearly felt Thacker was unqualified to testify regarding causation, the court did not make a determination as to whether Thacker was qualified to testify about which statutes, rules, regulations, or requirements regarding class B fireworks were applicable to this case.

Thacker's experience in monitoring an annual commercial fireworks display for 10 years arguably qualified him to testify at

least to which NFPA 1123 requirements were applicable to this case and to what objective facts he had learned through his investigation, for example, whether the defendants had the required licenses or permit. However, his testimony would not have been of any special help to the jury in determining whether the requirements and regulations had actually been violated. See *Simon*, 260 Kan. 731, Syl. ¶ 4 ("Expert testimony concerning customs or industry standards is not relevant, or at least unnecessary, where the jury is competent from its own experience to determine and apply the reasonable care standard."). With knowledge of the relevant industry standards and objective accident facts, the jury would have been just as capable of determining whether NFPA 1123 was violated as was Thacker.

Accordingly, the trial court's exclusion of Thacker's opinions regarding causation and violations of pertinent statutes, regulations, and NFPA 1123 is affirmed. However, for the reasons expressed above in addressing the admissibility of pertinent provisions of Kansas statutes, regulations, and NFPA 1123 regarding industry standards of care, the trial court's exclusion of Thacker's opinion as to which of these were applicable to this case is reversed. Upon remand, evidence of the relevant Kansas statutes, regulations, and NFPA 1123 requirements is admissible and should be submitted for the jury's consideration.

*OPINION TESTIMONY REGARDING THE NUMBER OF TIMES THE MORTAR TUBE HAD BEEN FIRED*

Pullen argues the trial court abused its discretion by ruling that Leslie Pfannenstiel's proffered testimony regarding the number of times a mortar tube had been used was inadmissible expert testimony rather than admissible lay opinion testimony.

"Whether a witness, expert or layman, is qualified to testify as to his or her opinion is to be determined by the trial court in the exercise of its discretion. That discretion is not subject to review except for abuse." *Hawkinson v. Bennett*, 265 Kan. 564, Syl. ¶ 8, 962 P.2d 445 (1998). Discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would

take the view adopted by the trial court. *State v. Price*, 275 Kan. 78, 83, 61 P.3d 676 (2003).

Pfannenstiel is a licensed pyrotechnician, a wholesaler and retailer of display fireworks, and part of his business involves checking in and out mortar tubes at least once or twice a year. He sold or loaned the 12 mortar tubes to Krehbiel which were used in the fireworks display in this case. In a pretrial deposition, Pfannenstiel compared a mortar tube which had been used in over 75 launchings to a paper mortar submitted as one of the mortar tubes used during the display. At trial, Pfannenstiel proffered testimony that a mortar tube admitted into evidence as one being used in the display did not look like it had been used for 75 to 100 launchings as the prior testimony in the case reflected. He acknowledged that he had examined the mortar tube and had estimated that only 7 to 12 launchings had been made from that particular mortar based on the coloration inside the tube.

The trial court concluded that the proffered testimony constituted expert testimony which was inadmissible because Pullen had failed to identify Pfannenstiel as an expert and had failed to provide an expert report as required by court order. The court also found that the opinion testimony had insufficient foundation. On appeal, Pullen contends that Pfannenstiel's testimony should have been admitted as "lay opinion" testimony under K.S.A. 60-456(a), which provides:

"If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony."

K.S.A. 60-456(a) permits opinion testimony by a witness not testifying as an expert if such an opinion is incidental to the witness' actual knowledge of the facts and circumstances of the case. *Moore v. Associated Material & Supply Co.*, 263 Kan. 226, Syl. ¶ 10, 948 P.2d 652 (1997).

The defendants argue that Pfannenstiel's lay opinion was inappropriate because he did not directly observe the events at issue and his testimony regarding the mortar tubes was expert in nature.

As noted above, K.S.A. 60-456(b) limits expert opinion testimony to those inferences and opinions the trial court finds are "(1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

K.S.A. 60-419 sets out the standard regarding the competency of either an expert or lay witness to testify:

"As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience, training or education if such be required. Such evidence may be by the testimony of the witness himself or herself. The judge may reject the testimony of a witness that the witness perceived a matter if the judge finds that no trier of fact could reasonably believe that the witness did perceive the matter."

Keeping in mind these authorities, we first note that the proffered testimony was relevant to determining whether the industry standard permitting 7 launchings was violated and to challenge the credibility of Brian West, who submitted the mortar tube as one having been used during the display, and Krehbiel, who opined that it had been used 75 to 100 times. Despite its relevancy, the trial court determined it was expert testimony subject to exclusion for failure to comply with court orders involving expert testimony. There is no dispute that Pullen failed to identify Pfannenstiel as an expert and failed to file a report. Thus, the exclusion of Pfannenstiel's proffered testimony on this basis constituted no abuse of discretion.

The ultimate issue to be resolved is whether the trial court abused its discretion in determining that Pfannenstiel's testimony was expert in nature. Based upon the record before us, we cannot say that no reasonable person would agree with the trial court's ruling that an opinion regarding the number of times commercial, class B fireworks were launched from a mortar tube was expert in nature.

In addition, we note that the trial court found Pfannenstiel's proffered testimony lacked sufficient foundation. Implicit in this determination was a finding that in accordance with the provisions of K.S.A. 60-456(b), the opinions were not "within the scope of the special knowledge, skill, experience or training possessed by the

witness." The trial court thus determined that Pfannenstiel lacked sufficient qualifications to render an opinion. Even if the testimony was characterized as a lay opinion, the trial court found that Pfannenstiel lacked the personal knowledge and experience to express an opinion as to the number of times the mortar tube presented to him in the deposition had been used. As Pfannenstiel admitted that he only checked mortar tubes in and out once or twice a year and did not personally observe the fireworks incident, we cannot say that no reasonable person would agree with that determination.

The trial court is affirmed in part and reversed in part, and the case is remanded for a new trial.